UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
ABRAHAM LESER

                    Plaintiff,

          -against-

U.S. BANK NATIONAL ASSOCIATION,

                    Defendant.
-----------------------------------X
U.S. BANK NATIONAL ASSOCIATION,

          Counterclaim Plaintiff,

          v.

ABRAHAM LESER,

          Counterclaim Defendant.
-------------------------------x

**NOT FOR PRINT OR
ELECTRONIC PUBLICATION**

**MEMORANDUM & ORDER**
09-CV-2362 (KAM)(MDG)

**KIYO A. MATSUMOTO, UNITED STATES DISTRICT JUDGE:**

          Plaintiff/counterclaim defendant Abraham Leser

("Leser") seeks a declaratory judgment from this court that

certain personal guaranties for two real estate loan development

projects are not enforceable against him.  (ECF No. 1, Complaint

("Compl.").)  Defendant/counterclaim plaintiff U.S. Bank

National Association ("USB") has counterclaimed, alleging two

claims for breach of contract and one claim of unjust enrichment

against Leser based on the same development projects.  (ECF No.

11, Answer and Counterclaim ("A&C").)

1

Before the court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Leser moves for summary judgment on the complaint and USB's counterclaims, arguing that the court should issue a declaratory judgment that the personal guaranties related to certain loans are unenforceable against Leser. (ECF No. 121, Leser's Motion for Summary Judgment ("Pl.'s Mot."); ECF No. 123, Affidavit of Mark Geisler, Esq. ("Geisler Aff."); ECF No. 124, Leser's Rule 56.1 Statement ("Pl.'s 56.1 Stmt."; ECF No. 125, Leser's Memorandum in Support ("Pl.'s Mem.").) USB moves for partial summary judgment regarding whether the personal guaranty for a certain Seattle real estate transaction is enforceable against Leser. (ECF No. 126, USB's Motion for Partial Summary Judgment ("Def.'s Mot."); ECF No. 126-1, USB's Memorandum in Support ("Def.'s Mem."); ECF No. 126-2, USB's Rule 56.1 Statement ("Def.'s 56.1 Stmt."); ECF No. 126-3, Affidavit of Steven Cooper, Esq. ("Cooper Aff.").) Both parties submitted opposition memoranda and Rule 56.1 counterstatements in opposition to each other's motions. (ECF No. 129, Leser's Memorandum in Opposition ("Pl.'s Opp."); ECF No. 130, Leser's Rule 56.1 Counterstatement ("Pl.'s 56.1 Counterstmt."); ECF No. 127, USB's Memorandum in Opposition ("Def.'s Opp."); ECF No. 127-1, USB's Rule 56.1 Counterstatement ("Def.'s 56.1 Counterstmt."); ECF No. 127-2, Affidavit of Michael DiCanio,

Esq. ("DiCanio Aff.").)  Likewise, they both submitted reply
memoranda in support of their respective motions.  (ECF No. 132,
Leser's Reply Memorandum ("Pl.'s Reply"); ECF No. 131, Affidavit
of Mark Geisler, Esq. ("Geisler Reply Aff."); ECF No. 133,
Leser's Reply Rule 56.1 Statement[1] ("Pl.'s Reply 56.1 Stmt.");
ECF No. 128, USB's Reply Memorandum ("Def.'s Reply").)  USB
initially requested oral argument on these motions but
subsequently withdrew the request.  (*See generally* ECF Nos. 136,
139.)

        For the reasons stated below, the court DENIES both
parties' motions for summary judgment.

**BACKGROUND**

        The following relevant facts,[2] taken from the parties'
statements pursuant to Local Civil Rule 56.1 and the record, are
undisputed unless otherwise indicated.  The court has considered
whether the parties have proffered admissible evidence in
support of their positions and has viewed the facts in the light
most favorable to the nonmoving party when considering each

---

[1] USB also asked that Leser's "Reply" Rule 56.1 Statement be stricken from the
record. (ECF No. 134, letter from Michael DiCanio, Esq. dated 9/21/2011.)
After considering Leser's response (ECF No. 135, letter from Mark Geisler,
Esq. dated 9/22/2011), the court denied USB's request to strike the Reply
56.1 Statement and notified the parties that it would be considered on
Leser's motion for summary judgment (*see* docket entry dated 9/22/2011).
[2] The parties have submitted hundreds of pages of exhibits and deposition
transcripts regarding disputed background facts of this case.  The court will
thus address only the facts (disputed and undisputed) germane to the instant
decision; the parties' familiarity with the balance of the record is
presumed.

motion.  The paucity of undisputed facts illustrates the futility of the instant motions for summary judgment.

Leser is an individual working and residing in Brooklyn, New York.  (Def.'s 56.1 Stmt. ¶¶ 1, 8; Pl.'s 56.1 Counterstmt. ¶¶ 1, 8.)  He owns and/or controls several companies.  (*See* Def.'s 56.1 Stmt. ¶ 5; Pl.'s 56.1 Counterstmt. ¶ 5; ECF No. 126, Ex. 1, Deposition of Abraham Leser ("Leser Dep.") at 42-45.)  Leser's "basic business model" is for his companies to buy a property which they then develop and manage, ideally for a long period of time.  (Leser Dep. at 109.)  Approximately 90% of the properties purchased by Leser's companies are fully or at least partially developed, as opposed undeveloped properties that need development.  (*Id.; see also* Def.'s 56.1 Stmt. ¶ 6; Pl.'s 56.1 Counterstmt. ¶ 6.)

The two USB financial transactions[3] at issue in this litigation are a draw-down loan made to VTE, Philadelphia L.P. (the "VTE Borrower") and a draw-down loan made to (1) Reuben Corporation; (2) Bronx AL LLC; (3) Bronx RMT LLC; and (4) JJ

---

[3] Notably, USB has taken inconsistent positions on whether these transactions should be termed "loans."  For instance, in support of its own motion for summary judgment, USB avers that it "loaned" the Seattle Borrowers $21,000,00.  (Def.'s 56.1 Stmt. ¶ 28.)  Yet, in connection with Leser's motion, USB *denied* that it "loaned" the Seattle Borrowers anything and insisted on the "right to draw down . . . proceeds" language used herein. (Def.'s 56.1 Counterstmt. ¶¶ 2-3.)  In response, Leser argued that these transactions be formally termed "loans."  (*See* Pl.'s Reply 56.1 Stmt. ¶¶ 2-3.)  Despite the parties' troubling gamesmanship in their respective 56.1 Statements and Counterstatements, the "right to draw down . . . proceeds" language proffered by USB in response to Leser's motion appears to be more accurate.

Lyons Associates, Inc. (collectively, the "Seattle Borrowers").
(Leser Dep. at 32-33.)  Leser is affiliated with the VTE
Borrower and Seattle Borrowers, which each owned about 20% of
the properties that were the subject of the VTE and Seattle
loans, respectively.  (*Id*. at 62-64.)

Specifically, on or about July 27, 2007, USB entered
into certain loan agreements with the VTE Borrower which granted
the VTE Borrower the right to draw down $17,500,000 in proceeds
(the "VTE loan").  (Def.'s 56.1 Counterstmt. ¶ 2.)  On or about
November 21, 2007, USB entered into certain loan agreements with
the Seattle Borrowers which granted the Seattle Borrowers the
right to draw down $21,000,000 in proceeds (the "Seattle loan").
(Def.'s 56.1 Counterstmt. ¶ 3.)  Leser, as an individual, is not
a borrower on either the VTE or Seattle loans. (Pl.'s 56.1 Stmt.
¶¶ 6-7; Def.'s 56.1 Counterstmt. ¶¶ 6-7.)

Eli Verschleiser and his company, Multi-Capital Group,
a real estate investment banking firm, served as a broker for
both the VTE and Seattle Loans.  (Pl.'s 56.1 Stmt. ¶ 13; Def.'s
56.1 Counterstmt. ¶ 13.)  In connection with the Seattle loan,
Verschleiser prepared a Memorandum intended to market the
Seattle project, which was provided to USB.  (Def.'s 56.1 Stmt.
¶¶ 13-14; Pl.'s 56.1 Counterstmt. ¶¶ 13-14.)  This Memorandum
identified Leser as the "sponsor" of the Seattle loan.  (Def.'s
56.1 Stmt. ¶ 19; Pl.'s 56.1 Counterstmt. ¶ 19.)  Nonetheless,

Leser denies that he ever approved the content of the Memorandum and denies that he served as the "sponsor" of the Seattle project. (Pl.'s 56.1 Counterstmt. ¶¶ 17–19.)

As part of both the VTE and Seattle loan transactions, notarized personal guaranties[4] purporting to bear Leser's signature were provided to USB (collectively, the "Guaranties"). (Def.'s 56.1 Stmt. ¶ 51; Pl.'s 56.1 Stmt. ¶¶ 85–87; Def.'s 56.1 Counterstmt. ¶¶ 85–87; Pl.'s Reply 56.1 Stmt. ¶¶ 85–87.) Thereafter, the Seattle loan proceeds[5] were drawn upon by the borrower entities.  (See Def.'s 56.1 Stmt. ¶¶ 76–83 (describing draw requests and receipt of the Seattle loan proceeds); Pl.'s 56.1 Counterstmt. ¶¶ 76–83.)

On February 17, 2009, USB notified the Seattle Borrowers that the Seattle loan was in default, and that, if the default was not cured within 30 days, it would constitute an Event of Default under the terms of the Seattle loan.  (Def.'s 56.1 Stmt. ¶ 91; Pl.'s 56.1 Counterstmt. ¶ 91; ECF No. 126, Ex. 51.)  Consequently, USB sought payment on the outstanding amounts from Leser, the purported personal guarantor. (Pl.'s 56.1 Stmt. ¶ 83; Def.'s 56.1 Counterstmt. ¶ 83.)  On or about

---

[4] The parties dispute whether the two persons whose notary stamps appear on the Guaranties, Robert Lovy and Chaya Schlafrig, actually notarized the Guaranties and how, if at all, the notarizations were carried out. (See, e.g., Pl.'s 56.1 Stmt. ¶¶ 26–60; Def.'s 56.1 Counterstmt. ¶¶ 26–60; Pl.'s Reply 56.1 Stmt. ¶¶ 26–60.)

[5] USB did not move for summary judgment on the VTE loan.  Leser moved for summary judgment on both loans, but none of his record citations address the details of the actual receipt of the VTE loan proceeds.  (See generally Pl.'s 56.1 Stmt.)

February 25, 2009, USB's representatives met with Leser, Eli
Verschleiser and Chaim Miller at Leser's office, and discussed
the need to bring the interest current on the loans.  (*Id.*)  The
purported existence of the Guaranties was discussed as well,
and, according to Leser, this was the first time he learned that
USB believed he had executed the Guaranties.  (Pl.'s 56.1 Stmt.
¶ 87; Def.'s 56.1 Stmt. ¶ 97; Pl.'s 56.1 Counterstmt. ¶ 97.)
Leser did not make any statements at the meeting as to the
validity or existence of the Guaranties.  (Def.'s 56.1 Stmt. ¶
98; Pl.'s 56.1 Counterstmt. ¶ 98; *see also* Leser Dep. at 160.)
Subsequently, Leser denied that he ever signed the Guaranties
and stated that the notarized signatures purporting to be his on
the Guaranties were not genuine.  (*See, e.g.*, Pl.'s 56.1 Stmt. ¶
1; Leser Dep. at 155, 204, and October 2010 Vol. at 192; Compl.
¶¶ 9-10, 16-17.)

        On June 4, 2009, Leser filed a complaint seeking
declaratory judgments that both the VTE and Seattle loan
Guaranties are unenforceable against him.  (Compl. ¶¶ 19-24.)
On September 11, 2009, USB filed its answer, affirmative
defenses, and counterclaims.  (*See generally* A&C.)  USB raised
affirmative defenses of, among others, doctrines of waiver,
estoppel, ratification, unclean hands, and fraudulent
inducement.  (A&C at 4-5.)  USB also counterclaimed against
Leser for breach of contract with respect to the VTE and Seattle

7

Guaranties and alleged that Leser has been unjustly enriched by
retaining the benefit of the loans and refusing to repay their
combined total of $39,057,920.26.  (A&C at 8-10.)  Leser filed
his answer to USB's counterclaims on October 1, 2009.  (*See
generally* ECF No. 12, Leser's Answer to Counterclaims.)

Although the parties have devoted vast amounts of
money, time, and ink to these and many other ancillary facts in
the case, the dispositive issue is whether Leser actually signed
the VTE and Seattle loan Guaranties.  If Leser signed the
Guaranties, then he is personally liable for them.  If he did
not, then the question is whether: (i) an authorized
representative signed on Leser's behalf; or (ii) estoppel or
ratification prevents Leser from denying liability based on his
conduct before and after the loan closings.  If the answer to
both is no, then the parties will be left to discover the person
who actually signed the Guaranties[6] and determine if he or she is
liable for fraud or other tortious conduct against Leser, USB,
or both.

The clarity of the legal questions, however, stands in
stark contrast to the parties' contradictory factual submissions
and opposing expert reports.  Summary judgment in favor of
either party is thus inappropriate because there are genuine

---

[6] Leser has not provided any alternative theory as to who signed the
Guaranties on behalf of his entities, aside from his general belief that USB
"defrauded" him during these transactions.  (*See* Leser Dep. at 426-27.)

issues of material fact as to whether Leser signed the Guaranties or is otherwise liable through agency or estoppel principles.  For the reasons explained below, both parties' motions for summary judgment are denied.

## DISCUSSION

### I. Summary Judgment Standard

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).  "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.*

Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party.  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (internal citations omitted).

In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.  The moving party carries the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party.  *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001).  "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 174 (2d Cir. 2006) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture [are] insufficient to preclude the granting of the motion."); *Nat'l Westminster Bank USA v. Ross*, 676 F. Supp. 48, 51 (S.D.N.Y.1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."). Nor can the nonmoving party rest only on the pleadings. *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548 (stating that Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings"); *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). Instead, each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d).

When cross-motions for summary judgment are made, the standard is the same as that for individual motions for summary judgment. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  Each motion must be considered independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. *Id.*

II.        **Choice-Of-Law Analysis**

A federal district court sitting in diversity must apply the choice of law rules of the forum in which it sits. *See Bakalar v. Vavra*, 619 F.3d 136, 139 (2d Cir. 2010). Under New York law, where a case involves a contract with a clear choice-of-law provision, "[a]bsent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd*., 230 F.3d 549, 556 (2d Cir. 2000). As other courts have observed, however, this principle occasionally contradicts the general rule that where neither party raises the issue of choice-of-law and all parties cite exclusively to New York law, such "'implied consent' . . . is sufficient to establish choice of law'" in the Second Circuit. *Med. Research Assoc., P.C. v. Medcon Fin. Servs*., Inc., 253 F. Supp. 2d 643, 647 (S.D.N.Y. 2003) (quoting *Krumme v. WestPoint Stevens, Inc*., 238 F.3d 133, 138 (2d Cir. 2000)).

Here, both the VTE and Seattle Guaranties specify that Virginia law should apply in "matters of construction, validity and performance." (Def.'s Ex. 34A, 34B, 34C; Def.'s Opp. Ex. 84A-B.) Neither party addresses which state's laws should be applied to resolve the instant motions for summary judgment and both parties cite exclusively to New York law in their moving

12

papers.  Under these circumstances, courts in this circuit have
applied the law of a state other than the one specified in a
contract's choice-of-law provision where the parties have failed
to address the issue and also cited exclusively to the
alternative state's laws.  *See, e.g., Sunbelt Rentals, Inc. v.
Charter Oak Fire Ins. Co*., 839 F. Supp. 2d 680, 686 (S.D.N.Y.
2012) (applying New York law on motion for summary judgment
where both sides relied almost exclusively on New York law, even
though contract at issue specified that North Carolina law would
apply); *Prince of Peace Enters., Inc. v. Top Quality Food Mkt.,
LLC*, 760 F. Supp. 2d 384, 396-97 (S.D.N.Y. 2011) (finding that
parties "consented to application of New York law by briefing
all issues under New York law," despite evidence that disputed
contract was executed in California); *Diesel Props S.r.L. v.
Greystone Bus. Credit II LLC*, No. 07-cv-9580, 2008 WL 4833001,
at *7 (S.D.N.Y. Nov. 5, 2008) (applying federal common law to
contract that contained Italian choice-of-law clause, in part
because all parties cited to federal common law almost
exclusively); *see also Lehman v. Dow Jones & Co*., 783 F.2d 285,
294 (2d Cir. 1986) (noting that court was not obliged to
undertake an investigation of potential differences between New
York and California law and instead apply New York law when that
is the sole law cited by the parties).  Because neither party
has cited to anything other than New York law nor has either

party addressed the issue, the court finds that the parties have
consented to the application of New York law to this case,
despite the Guaranties' Virginia choice-of-law provisions.

Additionally, although Leser (like USB) has not
addressed the issue of which state's law should apply, Leser
argues that he did not sign the Guaranties and his purported
signatures are forgeries. (*See* Pl.'s 56.1 Stmt. ¶ 1; Leser Dep.
at 155, 204, and October 2010 Vol. at 192; Compl. ¶¶ 9-10, 16-
17.)  Where, as here, there are allegations that a contract was
procured by fraud, its choice-of-law provision is not
automatically binding.  *See Hartford Fire*, 230 F.3d at 556; *see
also Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile,
S.A.*, No. 08-cv-11371, 2012 WL 967301, at *5 (S.D.N.Y. Mar. 20,
2012) ("It would make little sense to resort to law simply
because it was designated by a contract provision in order to
determine whether that very contract is even operative.").
Ordinarily, where there is no clear choice-of-law provision that
governs, New York courts next undertake the traditional
"grouping of contacts" analysis to determine which state has the
most significant relationship to the transaction and the
parties.  *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.,
Inc.*, 447 F. Supp. 2d 329, 336 (S.D.N.Y. 2006) (internal
quotation marks omitted).  In cases like this one, however,
"such an analysis is unnecessary because the parties' briefs

14

assume that New York law controls and 'such implied consent . . . is sufficient to establish choice of law.'"  *Id*. at 336-37 (finding that New York law applied despite Indiana choice-of-law clause where one party had not clearly assented to the clause and all parties cited New York law exclusively in their briefs) (quoting *Krumme*, 238 F.3d at 138).  The court will, therefore, apply New York law in deciding the parties' respective motions.

**III.    Leser's Motion for Summary Judgment**

Leser seeks summary judgment in his favor on all the claims in his Complaint and on all of USB's counterclaims. Leser's argument in support of his motion is that "it is indisputable that Leser did not execute the [Guaranties]." (Pl.'s Mem. at 1.)  The court, however, must construe the facts in the light most favorable to USB (the nonmoving party), and all reasonable inferences and ambiguities must be resolved against Leser with respect to the disputed facts.  *Flanigan*, 242 F.3d at 83.  When viewed with these principles in mind, the record demonstrates that there are several material factual disputes which must be resolved by the trier of fact and, hence, Leser's motion for summary judgment is denied in its entirety.

**A.  Whether the Guaranties Bear Leser's Authentic Signatures**

As noted above, the parties dispute whether Leser himself signed the VTE and Seattle loan Guaranties.  The

15

question, then, is whether that dispute raises a genuine issue of material fact for the trier of fact to resolve.

On its face, the VTE loan Guaranty was notarized by Robert Lovy and bears Leser's signature. (*See* Pl.'s 56.1 Stmt. ¶ 28; Def.'s 56.1 CounterStmt. ¶ 28.)  The Seattle loan Guaranty appears to have been notarized by Chaya Schlafrig and also purports to bear Leser's signature. (ECF No. 126, Exs. 34A-C.) Leser, however, claims that the signatures purporting to be his on both Guaranties were forged and are not his own. (*See, e.g.*, Pl.'s 56.1 Stmt. ¶ 1; Leser Dep. at 155, 204, and October 2010 Vol. at 192; Compl. ¶¶ 9-10, 16-17.)

Both USB and Leser submitted reports from their respective handwriting experts[7] who reach different conclusions regarding whether Leser authored the contested signatures on the Guaranties.  USB's expert, Peter Tytell, concluded that the original signed versions of the VTE and Seattle Guaranties "were signed" by Leser. (ECF. No. 126, Ex. 60, Expert Report of Peter Tytell dated 2/2/11 ("Tytell Report") at 11.)  Tytell also determined that the examined copies of the original Guaranties were "highly probably" signed by Leser, which is the highest designation an expert can give to copied versions of signatures. (Tytell Report at 5, 11.)

---

[7] For the reasons described in footnote 9, *infra*, for the purposes of deciding this motion, the court accepts Baier's qualifications as an expert in forensic document examination and deems his reports admissible.

16

By contrast, Leser's expert, Robert Baier, concluded that one copy[8] of the VTE Guaranty was conclusively "not written by Abraham Leser," and that there were "indications" that one copy of the Seattle Guaranty was not written by Leser.  (ECF No. 123-45, Ex. HH, Expert Report of Robert Baier dated 4/9/10 ("Baier 4/9/10 Report") at 2.)  Baier further determined that it is "highly probable" that Leser did not sign a different copy of the VTE Guaranty, and that Leser "probably" did not sign two different copies of the Seattle Guaranties.  (ECF No. 123-46, Ex. II, Expert Report of Robert Baier dated 3/3/11 ("Baier 3/3/11 Report") at 2.)

Under New York law, "[w]here a document on its face is properly subscribed and bears the acknowledgment of a notary public, there is a 'presumption of due execution, which may be rebutted only upon a showing of clear and convincing evidence to the contrary.'"  *Chianese v. Meier*, 729 N.Y.S.2d 460, 466 (App. Div. 2001) (quoting *Spilky v. Bernard H. La Lone Jr. P.C.*, 641 N.Y.S.2d 916, 918 (App. Div. 1996)), *aff'd as modified*, 98 N.Y.2d 270 (2002); *accord Hedger v. Reynolds*, 216 F.2d 202, 202 (2d Cir. 1954) (same); *In re Piazza*, 181 B.R. 19, 21-22 (Bankr. E.D.N.Y. 1995) (same).

Generally, unsupported testimony of interested

---

[8] Baier did not examine original versions of either the VTE or Seattle Guaranties.  (Baier 4/9/10 Report at 2; Baier Report 3/3/11 at 2.)

witnesses is insufficient as a matter of law to rebut the
presumption that a notarized signature is authentic. *See, e.g.,
Demblewski v. Demblewski*, 701 N.Y.S.2d 567, 567-68 (App. Div.
1999); *Son Fong Lum v. Antonelli*, 476 N.Y.S.2d 921, 923 (App.
Div. 1984) ("[A] certificate of acknowledgment should not be
overthrown upon evidence of a doubtful character, such as the
unsupported testimony of interested witnesses, nor upon a bare
preponderance of evidence, but only on proof so clear and
convincing as to amount to a moral certainty."); *In re Piazza*,
181 B.R. at 21 (same).

Additionally, although testimony regarding whether a
notary usually witnessed signatures to be notarized or whether
he or she recalled witnessing a particular signature is relevant
to the question, such testimony alone does not sufficiently
rebut the presumption of authenticity accompanying notarized
signatures. *See Orix Fin. Servs. v. Phipps*, No. 91-cv-2523,
2009 WL 30263, at *5-6 (S.D.N.Y. Jan. 6. 2009) ("*Orix I*")
(holding that presumption of authenticity of notarized signature
on personal guaranty was not sufficiently rebutted by notary's
inability to recall witnessing challenged signature from 17
years earlier and her testimony that she did not usually witness
signatures). A handwriting expert's affidavit, however,
combined with averments of forgery *is* sufficient to rebut the
presumption of authenticity and to raise an issue of fact for

the fact-finder.  *See, e.g., First Indem. of Am. Ins. Co. v. Shinas*, No. 03-cv-6634, 2009 WL 3154282, at *8-9 (S.D.N.Y. Sept. 30, 2009) (finding witness's testimony along with expert submission sufficient evidence to raise triable issue of fact as to validity of notarized signature under New York law); *Orix Fin. Servs. v. Phipps*, No. 91-cv-2523, 2009 WL 2486012, at *2 (S.D.N.Y. Aug. 14, 2009) ("*Orix II*") (district court vacated its decision in *Orix I* insofar as finding that authenticity presumption *was* rebutted upon defendant's supplemental submission of handwriting expert's affidavit concluding that defendant did not sign guaranties at issue); *Orix Fin. Servs. v. Thunder Ridge Energy, Inc.*, No. 01-cv-4788, 2005 U.S. Dist. LEXIS 41889, *37-49 (S.D.N.Y. Dec. 29, 2005) (denying summary judgment in favor of plaintiffs seeking to enforce personal guaranty where notarized affidavit's presumption of authenticity was sufficiently rebutted by handwriting expert's affidavit averring that signatures did "not match" the authentic exemplars provided by defendants), *adopted by* 2006 U.S. Dist. LEXIS 54673 (S.D.N.Y. Mar. 7, 2006); *see also In re Piazza*, 181 B.R. at 22 (noting that "handwriting expert who could testify regarding the authenticity of the execution of the otherwise presumptively genuine document" was necessary to overcome presumption of due execution of notarized document where only other evidence of forgery was challenging party's testimony); *cf. Feehan v.*

*Feehan*, No. 09-cv7016, 2010 WL 3734082, at *10-11 (S.D.N.Y. July 26, 2010) (finding that lay witness's affidavit that notarized signature had been forged precluded grant of summary judgment, where witness satisfied Fed. R. Civ. P. 901(b)(2)'s requirements for layperson's authentication of handwriting).

Here, both parties have submitted expert reports[9] in support of their opposing positions regarding whether Leser

---

[9] The court rejects USB's argument that Robert Baier's expert reports should be disregarded on the instant motions.  USB argues that (i) Baier inadequately explained the reasoning and analyses he used during his examinations; (ii) Baier's opinion regarding the Seattle Guaranty was not conclusive enough to create an issue of material fact according to Baier's own standards; and (iii) Baier's education and experience are not sufficient to qualify him as an expert.  (Def.'s Opp. at 23-25, 29-30.)  Although Baier's reports are not "model Fed. R. Civ. P. 26(a)(2) [expert] disclosure[s], the lack of a detailed description of [Baier's] methodology is not so severe a defect as to warrant the total disregard of the affidavit[s]," *Thunder Ridge*, 2005 U.S. Dist. LEXIS 41889, at *44-45, especially given his deposition testimony which did set forth the methodology and reasoning Baier employed during his examinations.  (ECF No. 123-35, Ex. X, Deposition of Robert Baier ("Baier Dep.") at 146-152, 158-160, 163-166, 173-180 (discussing how Baier determined that the questioned documents fell outside the range of "normal" variations he detected in the known exemplars); *Id.* at 154-158, 183-188 (Baier's explanation of methodology and standards used in arriving at his conclusions).)  Moreover, Baier's initial opinion that there were "indications" Lesser did not write one particular copy of the Seattle Guaranty creates an issue of material fact because in his rebuttal report he found it "highly probable" that Lesser did not sign the other copies of the Seattle Guaranty he examined.  (*See* Baier 3/3/11 Report 1 at 3; Baier Dep. at 183-188.)  Whether that level of certainty will support Baier's findings goes to the weight of the evidence, not its admissibility, and it is the jury who must determine the weight to accord an expert's opinion.  *See, e.g., Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) (argument that test results are not sufficient evidence to support the experts' conclusions "goes to the weight, not the admissibility, of their testimony and reports").  Additionally, Baier's ten years of experience and training in the field of handwriting analysis described in his *curriculum vitae* (Baier 4/9/10 Report at 5-6), are sufficient to establish his qualifications.  *See, e.g., Thunder Ridge*, 2005 U.S. Dist. LEXIS 41889, *45-46; *Cedar Petrochem.*, 769 F. Supp. at 283 ("In considering a witness's practical experience and educational background as criteria for [expert] qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.").  For these reasons, the court deems admissible and considers Baier's reports on the instant motions.

signed the Guaranties.  As noted above, the experts' conclusions are in direct opposition with each other.  Given that whether Leser actually signed the Guaranties is arguably the most important dispute in this case, there is no doubt that the parties' vehement disagreement and conflicting evidence on this point is material and precludes summary judgment in favor of Leser.

## IV.  USB's Motion for Summary Judgment

USB moves for partial summary judgment regarding the enforceability of only the Seattle Guaranty against Leser. Specifically, USB argues that Leser cannot rebut the legal presumption of authenticity attached to the notarized Seattle Guaranty, and thus, USB can demonstrate both the execution of the Seattle Guaranty and non-payment thereof, which entitle a lender to summary judgment when enforcing a personal guaranty. (Def.'s Mem. at 17-25.)  USB also argues that knowledge of Leser's obligations under the Seattle Guaranty should be imputed to Leser through the Seattle Borrower's broker and counsel during the negotiations with USB.  (*Id.* at 25-28.)  Further, USB asserts that Leser's conduct after the Seattle loan closing estops him from now denying liability on the Seattle Guaranty, because USB relied on Leser's "silence" regarding his lack of obligations under the Guaranty to its detriment.  (*Id.* at 28-30.)  For the reasons explained below, USB's motion must also be

21

denied because genuine issues of material fact exist with respect to all its contentions.

### A. Whether the Seattle Guaranty Bears Leser's Authentic Signature

USB argues that Leser cannot rebut the legal presumption of authenticity attached to the notarized Seattle Guaranty and, thus, USB can demonstrate both the execution of the Seattle Guaranty and non-payment thereof. (Def.'s Mem. at 17-25.) Leser responds that Robert Baier's expert reports, the deposition testimony of Leser and Chaya Schlafrig (the purported notary of the Seattle Guaranty), and the physical condition of the documents themselves establish an issue of genuine material fact as to whether Leser signed the Seattle Guaranty. (Pl.'s Opp. at 13-26.)

Under New York Law, for USB to enforce the Seattle Guaranty, it must demonstrate that: (1) USB is owed a debt by a third party (here, the Seattle Borrowers); (2) Leser guaranteed payment of the debt; and (3) neither the Seattle Borrowers nor Leser has paid the debt. *Samsara Inv. III, LLC v. Wallace*, No. 07-CV-9385, 2008 WL 3884362 (S.D.N.Y. Aug. 21, 2008) (citing *Chemical Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir. 1994)); *accord Es-Tee Realty Co. v. Soumekhian*, 323 Fed. App'x 3, 4 (2d Cir. June 19, 2008).

There are no disputes regarding the first and third

elements of USB's prima facie case.  However, as previously
discussed in connection with Leser's argument in support of his
motion *supra* Section III.A, the disagreement between the parties
and their respective experts on the authenticity of Leser's
signature on the Seattle Guaranty rebuts the presumption of
authenticity that normally attaches to notarized documents like
the Seattle Guaranty.  (*Compare* Baier 4/9/10 Report at 2, Baier
3/3/11 Report at 2, *and* Leser Dep. at 155, 204; *with* Tytell
Report at 11, *and* Leser Dep. at 278, 281.)  Thus, a material
question of fact exists as to whether Leser signed the Seattle
Guaranty and the jury must be the one to weigh and compare the
testimony of the parties' competing experts and other witnesses
with respect to the authenticity of Leser's signatures on the
Guaranties.  *See Globecon,* 434 F.3d at 174 (reversing district
court's grant of summary judgment in part because of
inappropriate credibility determination and noting that
"credibility, in the ordinary course of things, is for a fact-
finder to evaluate").

### B.   Whether Leser Is Liable on the Seattle Guaranty Through Agency

USB also argues that Leser's liability on the
Guaranties is established through agency.[10]  For the reasons that

---

[10] USB also raises a ratification claim as part of its argument based on
agency theory.  (*See* Def.'s Mem. at 26.)  Ratification is a doctrine relating
to agency, by which a principal may assent to and retroactively approve the
otherwise-unauthorized acts of another.  *In re Bennett Funding Group, Inc.*,

follow, there are disputed issues of material fact that prevent the court from finding that an agency relationship existed between Leser and any of the people USB argues were his agents.

According to USB, knowledge of the Seattle Guaranty should be imputed to Leser based on the knowledge of his "representatives in connection with the Seattle loan, including [Eli] Verschleiser and Seattle Borrower's Counsel." (Def.'s Mem. at 25-28.) Leser responds that the facts indicate that no one had the authority to sign any personal guaranty on his behalf with respect to the Seattle transaction. (Pl.'s Opp. at 26-28.)

"'New York common law provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'" *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (quoting *N.Y. Marine & Gen. Ins. Co. v. Tradeline, LLC*, 266 F.3d 112, 122 (2d Cir. 2001)). Additionally, "knowledge acquired by an agent acting within the scope of its agency is imputed to the principal, even if the information was never actually

---

336 F.3d 94, 100 (2d Cir. 2003). However, the court will address this claim as part of the estoppel analysis *infra* Section IV.C, because ratification and estoppel require a showing of all but one of the same legal elements and because the same disputed facts thwart both arguments. *Capital Dist. Physician's Health Plan v. O'Higgins*, 951 F. Supp. 352, 362 (N.D.N.Y. 1997) ("Ratification is concerned with the actual intent of the party against whom it is pled. The related doctrine of estoppel, by contrast, is concerned with what has been expressed to the party pleading that defense.").

communicated." *N.Y. Marine*, 266 F.3d at 122 (citation omitted).
To bind a principal in the first place, however, "an agent must
have authority," whether actual (as established through express
or implicit circumstances) or implied. *Merrill Lynch
Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998).

　　　　Under New York law, "an agent has actual authority if
the principal has granted the agent the power to enter into
contracts on the principal's behalf, subject to whatever
limitations the principal places on this power, either
explicitly or implicitly." *Highland Capital Mgmt. LP v.
Schneider*, 607 F.3d 322, 327 (2d Cir. 2010). "'Actual authority
is created by direct manifestations from the principal to the
agent, and the extent of the agent's actual authority is
interpreted in the light of all circumstances attending those
manifestations, including the customs of business, the subject
matter, any formal agreement between the parties, and the facts
of which both parties are aware.'" *Id.* (quoting *Peltz v. SHB
Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997)).

　　　　The "consent for actual authority may be either
express or implied from 'the parties' words and conduct as
construed in light of the surrounding circumstances.'" *Anwar v.
Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 435 (S.D.N.Y.
2010). "[I]mplied authority exists when verbal or other acts by
a principal reasonably give the appearance of authority to the

agent." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 260-61 (S.D.N.Y. 2002) (internal quotation marks omitted).  In the Second Circuit, implied authority is viewed as a "kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers." *Marfia v. T.C. Ziraat Bankasi*, 100 F.3d 243, 251 (2d Cir. 1996).  Thus, the general rule is that "an agent employed to do an act is deemed authorized to do it in the manner in which business entrusted to him is usually done." *Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 919 (S.D.N.Y. 1984).  "The question whether an agency relationship exists is highly factual . . . and can turn on a number of factors." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006).

Where a putative agent lacks actual authority, however, "he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists." *Highland*, 607 F.3d at 328.  "Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Peltz*, 115 F.3d at 1088 (internal quotation marks omitted); *see also Wells Fargo Home Mortg., Inc. v. Hiddekel Church of God, Inc.*,

781 N.Y.S.2d 628, 2004 WL 258144, *6 (N.Y. Sup. Ct. 2004)
("Essential to the creation of apparent authority are words or
conduct of the principal, communicated to a third party, that
give rise to the appearance and belief that the agent possesses
authority to enter into a transaction.") (internal quotation
marks omitted).  However, "[t]he mere creation of an agency for
some purpose does not automatically invest the agent with
'apparent authority' to bind the principal without limitation."
*Highland*, 607 F.3d at 328.  Thus, "[a] party cannot claim that
an agent acted with apparent authority when it 'knew, or should
have known, that [the agent] was exceeding the scope of its
authority.'"  *Id.* (quoting *Sphere Drake Ins. Ltd. v. Clarendon
Nat'l Ins. Co.*, 263 F.3d 26, 33 (2d Cir. 2001)).

        With respect to whether knowledge of the Seattle
Guaranty's existence can be imputed to Leser through his
relationship with either Eli Verschleiser, the mortgage broker
on the Seattle deal, or counsel for the Seattle Borrowers, the
first question is whether any of these parties can be deemed
Leser's actual agent (based on either express or implied
consent) or apparent agent.  If so, then the knowledge of such
agent(s) would be properly imputed to Leser.  *See N.Y. Marine*,
266 F.3d at 122.  As demonstrated below, when drawing all
inferences in favor of the non-movant, Leser, genuine issues of
material fact exist regarding whether Verschleiser or the

27

Seattle Borrower's Counsel acted as any kind of legal agent for Leser with respect to executing the Seattle Guaranty.

### 1. Eli Verschleiser

Although USB argues that Eli Verschleiser, as the mortgage broker/advisor for the Seattle transaction, was "clearly" authorized by Leser to act on Leser's behalf in connection with that loan, Leser responds that Verschleiser lacked any authority to accept or ratify the Seattle Guaranty on Leser's behalf.  (Pl.'s Opp. at 27.)  Leser further notes that (i) there is no agreement between Verschleiser and Leser authorizing Verschleiser to do anything on Leser's behalf, (ii) one of USB's employees, Gregory Wilson, admitted that he was not aware of anything to which Verschleiser could bind Leser, and (iii) Susan Shyne (an attorney based in Seattle who represented the Seattle Borrowers) also did not believe Verschleiser was Leser's agent.  (*Id*. (citing ECF No. 123-22, Ex. P, Deposition of Eli Verschleiser ("Verschleiser Dep.") at 619; ECF No. 123-5, Ex. E, Deposition of Gregory Wilson ("Wilson Dep.") at 131; and ECF No. 123-34, Ex. W, Deposition of Susan Shyne ("Shyne Dep.") at 130-131).)

The court's review of the record demonstrates that a genuine issue of fact exists as to whether Verschleiser had Leser's express consent to act as Leser's actual agent regarding the Seattle Guaranty.  USB has not identified evidence showing

28

the manifestation and scope of any "express" actual authority conferred by Leser to Verschleiser, *see Highland Capital*, 607 F.3d at 327; rather, Verschleiser testified that there is no authorization or agency agreement between him and Leser, nor was USB's Wilson aware of any such authority.  (Verschleiser Dep. at 619; Wilson Dep. at 131.)

There are also disputes in the record regarding whether Verschlesier was Leser's implied actual agent by virtue of "the manner in which business entrusted to him [was] usually done," *Songbird Jet*, 581 F. Supp. at 919, or Verschleiser's possession of powers that would ordinarily include the ability to bind Leser, *see Marfia*, 100 F.3d at 251-52.  Indeed, the manner in which Verschleiser "usually" did the business entrusted to him by Leser was irregular at best.  For example, Verschleiser testified that:

- Although Verschleiser's company was serving as the mortgage advisor for the Seattle loan, he does not recall if he acted as an intermediary between USB and Leser when the Seattle loan was being negotiated and does not recall retrieving information for USB's counsel in connection with the Seattle Loan, despite an email in which Verschleiser reported to USB's counsel that Verschleiser would follow-up with one of Leser's employees, Chaim Miller.  (Verschleiser Dep. at 210-14.)

- In his general practice as a mortgage advisor, Verschleiser made statements to lenders and borrowers designed to keep negotiations afloat, even if they were not accurate:

    "[S]ome lenders will like to have

> guarant[ies] . . . and for the most part if
> a lender wants a guarant[y] our job at the
> time as an investment banking firm was to
> get our transactions closed so we got our
> fees.
>
> We many times will tell a borrower what
> would you like and a borrower will say
> obviously I would like no guarant[ies], and
> we will say okay, that's what we're going to
> try to get for you, and then a lender would
> say I'm not going to make a loan without a
> guarant[y] and we'll say okay, that's not an
> issue.
>
> And until a closing actually happens
> things change many, many times and our job
> was to be an intermediary and get the
> borrower and the lender comfortable to close
> a transaction that was – that was being
> contemplated, or close the loan.
>
> So anything in these emails that may
> refer to guarant[ies], suretyships, payment
> completion, whatever it may be, from my
> perspective is, again, just part of that
> entire process flow, which from our
> perspective was trying to get the borrower
> and the lender to a closing table to close
> the transaction." (*Id*. at 268-70.)

- Verschleiser does not recall asking for any personal
  financial information from Leser for the VTE and
  Seattle loans, but recalls that his company already
  had Leser's personal financial information by the time
  of those loans because they "always" worked on
  transactions with Leser. (*Id*. at 224.)  He does not
  recall specifically if he had oral consent from Leser
  to disclose the financial information to potential
  lenders, and generally he does not ask specific
  permission from clients to do so. (*Id*. at 229-30.)

- When shown a letter Verschleiser wrote on May 18, 2009
  to Alan Owens, a USB representative, wherein
  Verschleiser stated that he was writing "on behalf of
  Leser," Verschleiser did not recall if Leser did, in
  fact, authorize him to write the letter.  (*Id*. at 439-
  442.)  Although Verschleiser agreed that he "probably
  would not have written that [he] were [*sic*] writing on
  [Leser's] behalf" without Leser's knowledge,

Verschleiser also stated that he did not necessarily get the information in the letter from Leser himself -- "it could be that someone was doing it on his behalf" and that Verschleiser was just relaying information "not necessarily" with Leser's knowledge. (*Id*. at 439-442, 451.) Verschleiser further testified that Leser "probably did not" ask Verschleiser to include in the letter the phrase: "I would like to point out that any legal action taken against Mr. Leser at this time will jeopardize the HUD 221(d)(4) loan." (*Id*. at 456-57.)

Additionally, although one of the Seattle Borrower's attorneys, Susan Shyne, viewed Verschleiser as "the gatekeeper" to Leser with respect to getting documents signed, she did not believe that Verschleiser was Leser's agent with authority to make any decisions for Leser. (Shyne Dep. 130-32, 144-148.) Because there are genuine issues of material fact as to whether Verschleiser should be deemed Leser's agent based on implied consent, USB cannot be granted summary judgment on this issue.

There are also genuine issues of material fact as to whether Leser communicated with USB in a manner that gave rise to the appearance and belief that Verschleiser possessed authority to bind Leser, as required to establish apparent authority. *See Wells Fargo Home Mortg.*, 2004 WL 258144, at *6. The court can find no evidence in the record showing a communication from Leser to USB regarding Verschleiser's role in the transaction.[11]  Even if such evidence were presented,

---

[11] USB cites to a portion of the deposition transcript of Robert Doyle (a USB employee) for the proposition that Leser participated "in at least one meeting with USB discussing the Loans, the guaranties and/or the subsequent

however, USB would still have to overcome the fact that "[a]
party cannot claim that an agent acted with apparent authority
when it 'knew, or should have known, that [the agent] was
exceeding the scope of its authority.'" *Highland Capital*, 607
F.3d at 328 (quoting *Sphere Drake*, 263 F.3d at 33).  This USB
cannot do on a motion for summary judgment because, in addition
to Verschleiser's equivocal testimony regarding almost every
aspect of the Seattle loan (which the jury will have to sort
out, *see Globecon*, 434 F.3d at 174-75), the documentary evidence
contradicts USB's position that it had no reason to know that
Verschleiser was exceeding the scope of his authority in his
dealings with USB.

        For example, USB's Exhibit 55 is an email chain
between Verschleiser and Alan Owens (a USB representative) dated
May 18-21, 2009 in which Owens makes repeated demands to
Verschleiser that Leser bring current the interest payments on
both loans.  (ECF No. 126, Ex. 55.)  Although USB claims this
document shows Verschleiser acceding to the existence of the
Guaranty on Leser's behalf, and hence, creates apparent
authority in Verschleiser, it actually creates questions about

---

default of the Loans" in support of its argument that Verschleiser was
Leser's apparent agent.  (Def.'s Mem. at 27.)  The cited transcript portion,
however, is extraordinarily vague and barely supports any of USB's
contentions.  However, as discussed *infra* Section IV.C, the court is aware of
Leser's own testimony admitting to being present at the February 2009 meeting
with USB representatives at which the Loans' default and the purported
existence of personal guaranties were discussed.  (Leser Dep. at 151-52,
160.)

the scope of Verschleiser's authority.

        First, after Verschleiser suggested an in-person meeting between Owens and Verschleiser, Owens balked, prompting Verschleiser to write: "I guess you are missing the point. I have NO benefit from this being resolved or not.  We got our fees and will not get paid further.  The only reason WE are involved is a professional courtesy to a client that is mutual amongst us."  (ECF No. 126, Ex. 55 at PLTF 2821.)  Verschleiser thus segregated his own interests as a broker from Leser's as a borrower.  Owens appears to have understood this when he responded as follows:

> Eli – Mr. Leser is not communicating with us and since he is communicating with you perhaps you can talk [some] sense into him, because we apparently haven't been able to do so. . . .
>
> *   *   *
>
> I have no issues with you, and I do appreciate the offer, but a meeting with you without the written consent of Mr. Leser has some risk to the bank as it could be the basis for an allegation by Mr. Leser of tortious interference in Mr. Leser's other business interests.  Such a meeting is a possibility with his consent after the interest is brought current . . . .

(Ex. 55 at PLTF 2820.)  It is thus difficult to accept USB's argument that Verschleiser was Leser's agent with respect to the Guaranty when USB's representative acknowledged the lack of such authority and the danger to the bank therefrom a year and a half

33

after the transaction.

Additionally, as USB's Exhibit 56 shows, a few days later, Owens continued to express his understanding that Verschleiser was not Leser's agent when it came to actually making decisions, when he wrote an email to Verschlesier dated May 27, 2009, again asking for Verschleiser's help in reaching Leser:

> Eli – I am sorry you got dragged into this, [it's] not your problem.  However, as you know the last Friday deadline for bringing the loans current as to interest was not met, and notwithstanding Mr. Leser's reported statement to you that he was prepared to immediately bring both loans current we have received no funds. . . .  If [the loans are not brought current] I will instruct the Bank's counsel to update and serve the complaint. . . .  Since Mr. Leser is talking with you, and has not communicated with me or [USB representative] Greg Wilson, I would appreciate it if you would pass that along to him.

(ECF No. 126, Ex. 56 at USB 4224.)  Thus, USB knew that Verschleiser's role in the Seattle transaction was to communicate information, and was also aware that Verschleiser and Leser's interests were not identical and that Leser's compliance with loan payments were not Verschleiser's "problem." This knowledge, coupled with Owens' earlier statement acknowledging the need for written consent from Leser to allow USB to negotiate with Verschleiser alone, creates a genuine issue of fact as to whether Verschleiser was Leser's agent with

34

the apparent authority to bind Leser to the Guaranties.  *See,*
*e.g., Highland Capital*, 607 F.3d at 328 ("A party cannot claim
that an agent acted with apparent authority when it knew, or
should have known, that [the agent] was exceeding the scope of
its authority.") (internal quotation marks omitted).

In sum, Verschleiser's testimony contains several
internal contradictions regarding the details of his involvement
in the Seattle loan and also seemed to contradict written
evidence at times, presenting a close question as to whether his
testimony creates any genuine issues of material fact.
Nonetheless, the court cannot agree with USB's argument that
Verschleiser, his company, and/or his employees were Leser's
agents with the power to bind Leser to the Seattle Guaranty
without discrediting at least two emails (Exhibits 55 and 56)
and Verschleiser's and Shyne's testimony to the contrary.
Accordingly, the credibility of that testimony and how much
weight the testimony and the emails should be afforded it must
be resolved by the jury.  *See Globecon,* 434 F.3d at 174-75.

### 2.   "Seattle Borrowers' Counsel"

USB also asserts that there is no dispute over whether
the "Seattle Borrowers' Counsel," defined as attorneys Eric
Zipkowitz and Allan Weiss of Wachtel & Masyr (located in New
York) and attorney Susan Shyne of GordonDerr (located in
Seattle, Washington), were authorized by Leser to act as his

35

agents in connection with the Seattle Loan.  (Def. Mem. at 7,
27.)

          With respect to the Wachtel & Masyr attorneys, USB
particularly relies on an November 8, 2007 email from Eric
Zipkowitz to James Freedman, an attorney for USB, requesting
that Leser's guaranty for the Seattle loan "'NOT be a guaranty
of payment, but rather, more in the nature of collection (*i.e.*,
a personal guaranty of any deficiency, costs, etc., after a
foreclosure.'"  (Def.'s Mem. at 7-8 (quoting ECF No. 126, Ex.
17, 11/8/2007 email from Eric Zipkowitz to James Freedman).)
When Freedman replied that Leser's guaranty obligation could *not*
be limited only to payment, Zipkowitz did not respond
substantively; instead, on November 17, 2007, he emailed
Freedman revisions to the Seattle loan documents, including
specific revisions to the then-current version of the Seattle
Guaranty.  (*Id*. at 8 (citing ECF No. 126, Ex. 18, 11/17/2007
email from Eric Zipkowitz to James Freedman).)  According to
USB, such participation in negotiating the Seattle Guaranty's
terms demonstrates that Zipkowitz was acting as Leser's agent
during the Seattle deal.  (*Id*. at 27-28.)

          The problem with USB's position is that, although the
court would readily assume that a licensed attorney like
Zipkowitz would not accept terms during a negotiation without
his client's consent, it is not permitted to make that

36

inference[12] and credibility determinations in favor of a movant on a motion for summary judgment.  Further, USB has not identified evidence showing (i) the manifestation and scope of any express actual authority conferred by Leser to Zipkowitz or Weiss, *see Highland Capital*, 607 F.3d at 327; (ii) that Zipkowitz or Weiss was Leser's implied agent by virtue of "the manner in which business entrusted to him [was] usually done," *Songbird Jet*, 581 F. Supp. at 919, or his possession of powers that would ordinarily include the ability to bind Leser, *see Marfia*, 100 F.3d at 251-52 or (iii) that Leser communicated with USB in a manner that gave rise to the appearance and belief that Zipkowitz or Weiss possessed authority to bind Leser, as required to establish apparent authority, *see Wells Fargo Home Mortg.*, 2004 WL 258144, at *6.  The court cannot, therefore, grant USB's motion based on the theory that Zipkowitz or Weiss was Leser's agent.

The same observations apply to USB's argument that Susan Shyne was Leser's agent with respect to the Seattle deal. Shyne was local counsel for the Seattle Borrowers in connection with the Seattle loan, while Zipkowtiz served as primary counsel for the Seattle Borrowers.  (Shyne Dep. at 33-34, 37, 122.) Shyne testified that she never communicated directly with Leser (aside from one inapposite conference call).  (*Id.* at 124.)  Her

---

[12] Apparently neither Zipkowitz nor Weiss were deposed in this case.

contacts were Zipkowitz, the primary New York attorney for the borrowing entities, and Verschleiser, whom she viewed as the primary business contact for obtaining necessary documents. (*Id.* at 26-28, 118.)  She did not draft any of the Seattle loan documents, nor did she draft the organizational documents of the Seattle Borrowers.  (*Id.* at 40.)  She was not involved in negotiating the terms of the Seattle loan with the lender or the brokering of the loan, and she was not involved in determining whether a personal guaranty was needed.  (*Id.* at 39-40, 133-34.)  Moreover, her clients were the Seattle Borrower entities, not Leser as an individual.  (*Id.* at 122-23.)  Shyne further testified that she would not be able to represent both the borrower and a putative guarantor in the same transaction.[13] (*Id.* at 134.)  Because there are numerous facts set forth in Shyne's deposition contradicting USB's argument that Shyne served as Leser's agent during the Seattle deal, USB's motion must be denied on this ground as well.

---

[13] USB's reliance on Shyne's opinion letter for the Seattle loan – which stated that "the guarant[y] and the indemnity have been duly authorized and properly executed and delivered by the guarantor" – to establish Shyne's agency with respect to the Seattle Guaranty is misplaced for two reasons. (Def.'s Mem. at 12.)  First, the letter indicated that it was *not* confirming the authenticity of any signatures, as demonstrated by the disclaimer that the authors only *assumed* that "all signatures are genuine, all documents are authentic under these circumstances."  (Shyne Dep. at 107-09.)  Second, if Shyne had, in fact, been directed to opine on the signatures' authenticity, she would have had to cease her representation of the Seattle Borrowers due to a conflict of interest. (*Id.* at 134.)

     C.    **Whether Leser Is Liable on the Guaranties Through the Doctrines of Equitable Estoppel or Ratification**

USB also argues that the doctrines of estoppel and/or ratification warrant summary judgment in its favor because Leser remained silent with respect to the supposed invalidity of the Seattle Guaranty, with knowledge that his silence was being relied on by USB both during and after the Seattle loan negotiations. (Def.'s Mem. at 26, 28-30.) As discussed in further detail below, these two doctrines are very closely related and thus will be addressed together.

According to USB, the facts supporting its estoppel and ratification arguments are: (i) Leser provided USB with his financial statements, tax returns and numerous signed documents as required under the terms of the Seattle loan; (ii) Leser's signature appears on numerous Seattle loan documents identifying him as the Guarantor; (iii) USB received letters after the loan, on Leser's company letterhead, bearing his apparent signature that confirmed his status as Guarantor on the Seattle Guaranty; (iv) on or about the February 25, 2009 meeting at Leser's office between Leser and USB, the Seattle Guaranty was discussed and Leser offered to work with USB to identify additional collateral for the Seattle loan, but did not contest his signature on the

Guaranty; and (v) "despite numerous emails"[14] after the Seattle loan went into default, no one disputed the validity of Leser's signatures on the Seattle Guaranty.  (*Id.* at 29.)

In response, Leser argues that he did not know USB was "relying on their decision not to make any effort to communicate with him during the loan negotiation process," that USB has not identified any word or deed of his upon which USB could justifiably rely, and that UBS did not reasonably rely on anything Leser did to its detriment.  (Pl.'s Opp. at 28-29.) Leser also avers that there are genuine disputes regarding whether: (i) Leser provided USB with his financial statements; (ii) what Leser thought the role of "sponsor" to the transaction meant versus what USB thought it meant; (iii) the signatures purporting to be Leser's were genuine; (iv) Leser was shocked when he learned from USB post-default that he has signed personal guaranties and had to ask for copies of the loan documents because he did not have them already; and (iv) USB knew from past experience that Leser had a practice of not providing personal guaranties.  (*Id.*)

Further, Leser testified at his deposition that he

---

[14] Specifically, these include (1) email from Alan Owens to Ahuva Slamovits, dated May 18, 2009, but addressed to Eli Verschleiser (ECF No. 126, Ex. 53); (2) email from Verschleiser to Leser, forwarding correspondence between Verschleiser and Owens, dated May 18, 2009 (ECF No. 126, Ex. 54); (3) email from Verschleiser to Leser, forwarding additional correspondence between Verschleiser and Owens, dated May 18-21, 2009 (ECF No. 126, Ex. 55); email chains between Verschleiser and Owens, dated May 27, 2009 (ECF No. 126, Exs. 56-57).

first learned of the Guaranties' supposed existence at the February 2009 meeting with USB's representatives at Leser's office. (Leser Dep. at 151-52.) After hearing that USB believed a personal guaranty existed, Leser "started thinking, what are they talking about," and started "asking around" with the people in his office, including Chaim Miller. (*Id.*)

Indeed, when USB referred to personal guaranties at the February 2009 meeting, Leser "look[ed] at [Verschleiser] and I said, maybe I didn't hear right or whatever. I didn't want to make an issue with the bank in front of them – I didn't want to start a commotion immediately." (Leser Dep. at 161.) According to Leser, after the meeting he "came into the office like screaming at somebody and asking [*sic*] that I think somebody fooled me. . . . [T]hen, when I really looked into the transaction – I didn't even have the closing documents at that time." (*Id.* at 151.) He "distinctly" remembers being told by Verschleiser at some point "in the beginning" that there were no personal guaranties involved in the USB transactions, although when Leser asked Verschleiser about them after the meeting, Verschleiser claimed he did not remember and did not know whether there were personal guaranties and "didn't answer [Leser] clearly." (*Id.* at 156-58.) Leser felt "very upset and hurt" by Verschleiser's claim that he didn't remember there were personal guaranties or, if they did exist, that Chaim Miller

41

should have been aware of them. (*Id*. at 162-63.) Leser did not "want to elaborate" too much with Verschleiser on the topic, because Leser "felt he was fooled," although he did not know by whom. (*Id*. at 158-59.) Leser's investigation into who actually signed the Guaranties with his name led to his belief that:

> [USB] defrauded me a few ways, and insulted me and got me into a mess . . . . [T]he thing is, for fifty years I worked and here comes a bank that wanted to get rid of money and they found a guy they could hang their hat on and they did everything very sloppy, uncaring, just for the sake of closing . . . maybe somebody in the firm, in the bank, was even in cahoots with this loan, that I'm starting to think [*sic*]. . . . That's why I felt very, very upset. And I still am. I know myself that I did not sign a personal guarant[y]. There's nothing wrong of [*sic*] a deal going sour . . . . especially in times what happened in last [two or three] years in America. . . . [T]hat's why I feel that they're just trying to shove the blame. Instead of somebody taking the blame in the bank, they're trying to push it onto me.

(*Id*. at 426-27.) As a result of these feelings, Leser filed the instant Complaint in June 2009. (*Id*. at 427-31; *see also generally* Compl.)

## 1. Equitable Estoppel

The doctrine of "[e]quitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996). It is "properly invoked where the

enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). "Under New York law, the elements of equitable estoppel with respect to the party to be estopped are: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." *In re Vebeliunas*, 332 F.3d 85, 93-94 (2d Cir. 2003) (citing *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 594 (2d Cir. 1996)).  The party asserting estoppel must show with respect to itself: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reasonable reliance upon the conduct of the party to be estopped; and (3) prejudicial change in its position. *Id.* at 94.

Here, USB's equitable estoppel argument fails on summary judgment because of the material factual disputes regarding whether USB reasonably relied upon the conduct of Verschleiser, whom USB claims was Leser's agent.  As noted previously, there are disputed material facts as to whether Verschleiser (or anyone else) was Leser's agent with respect to executing the Seattle Guaranty. (*See supra* Section IV.B.) Moreover, Verschleiser's sworn testimony explaining the emails

sent between Verschleiser and USB's representatives contradicts
USB's assertion that Verschleiser knew and approved of the
existence of the Seattle Guaranty.[15]   Additionally, one of those
emails indicates that as late as May 20, 2009, USB actually knew
Verschleiser did not have authority to independently accept
terms of the Seattle Loan on Leser's behalf.  (ECF No. 126, Ex.
55 at PLTF 2820 (statement by Owens to Verschleiser that "a
meeting with you without the written consent of Mr. Leser has
some risk to the bank as it could be the basis for an allegation
by Mr. Leser of tortious interference in Mr. Leser's other
business interests").)  There are thus material factual disputes
regarding whether USB was reasonable in relying on the emails
that supposedly demonstrate Verschleiser's approval and/or
acquiescence to the existence of the Seattle Guaranty.

        The other facts USB relies upon to establish equitable
estoppel are also contradicted by the record.  For instance,
although USB argues that Leser sent USB his financial statements
and tax returns to induce USB to make the Seattle loan (Def.'s
Mem. at 29), Verschleiser testified that his company, which

---

[15] For example, with respect to Exhibit 55, although in an early part of the
email chain Verschleiser attempted to rebuff USB's assertion of the Guaranty
by writing that a lawsuit "would put USB in useless position as it relates to
Mr. Leser and his guarant[ies]," Verschleiser testified that he made this
comment in response to *USB's* apparent belief that Leser had executed personal
guaranties and did not reflect Verschleiser's own belief.  (Verschleiser Dep.
at 486-90, *see also id.* at 484-501.)  Verschleiser also stated that he would
not have necessarily mentioned that the Guaranties did not exist as an
additional reason USB should not sue Leser, due to the flow of negotiations.
(*Id.* at 486-90.)  Whether this testimony is credible is up to the jury.

actually brokered the loan and brought USB on as a lender,
already had Leser's personal financial information by the time
of the Seattle loan because he "always" worked on transactions
with Leser (Verschleiser Dep. at 224-25).  Verschleiser further
testified that he does not recall specifically if he had consent
from Leser to disclose Leser's financial information to
potential lenders, and generally he does not ask specific
permission from clients to do so.  (Verschleiser Dep. at 229-
30.)  In addition to the uncertain scope of Verschleiser's
authority to release Leser's financial information to USB, that
Leser's personal financial information was transmitted to USB
does not establish whether it was done with the understanding
that Leser was the *personal guarantor* of the loan versus the
sponsor.  Therefore, when drawing all reasonable inferences in
favor of Leser (the nonmoving party), there are facts on the
record casting doubt on the reasonableness of USB's reliance on
this information for estoppel purposes.

         USB also argues that Leser's "silence" with respect to
the VTE and Seattle Guaranties' validity during the February 25,
2009 meeting at his office with USB's representatives estops him
from challenging their validity in this case.  (Def.'s Mem. at
28-29.)  This argument relates to whether Leser's silence
"amounts to a false representation or concealment of material
facts" and whether USB reasonably relied on that silence.  *See*

*In re Vebeliunas*, 332 F.3d at 93-94.  As discussed below, there are disputed facts surrounding Leser's "silence" at the February 2009 meeting that preclude a finding of either element on summary judgment.

Leser testified at his deposition that he first learned of the Guaranties' existence at the February 25, 2009 meeting with USB.  (Leser Dep. at 151-52.)  When USB referred to personal guaranties at the February 2009 meeting, Leser "look[ed] at [Verschleiser] and I said, maybe I didn't hear right or whatever.  I didn't want to make an issue with the bank in front of them – I didn't want to start a commotion immediately."  (*Id.* at 161.)  Specifically, after hearing that USB believed a personal guaranty existed, Leser "started thinking, what are they talking about," and later started "asking around" his office.  (*Id.* at 151-52.)  Leser felt "very upset and hurt" by Verschleiser's claim that he did not know or remember whether there were personal guaranties or, if they did exist, that Chaim Miller should have been aware of them.  (*Id.* at 162-63.)  Approximately three-and-a-half months later, on June 4, 2009, having arrived at the belief that USB defrauded him in the course of the transactions, Leser filed a complaint seeking declaratory judgments that both the VTE and Seattle loan Guaranties are unenforceable against him.  (*Id.* at 426-31; *see also* Compl. ¶¶ 19-24.)

46

Leser's testimony explaining his reaction to learning about the Guaranties at the February 2009 meeting with USB creates a genuine issue of material fact as to whether Leser's "silence" at the meeting amounted to a concealment of facts. Leser testified to a colorable, strategic reason for his failure to object immediately and then did, in fact, object three-and-a-half months later via the instant Complaint.  The jury must decide, against the backdrop of the contested signatures and nebulous role played by Verschleiser, whether Leser's explanation of his actions is credible and is sufficient to find that Leser did not execute the Seattle Guaranty.  *See Globecon,* 434 F.3d at 174-75.  Additionally, the jury must also determine whether USB reasonably relied on Leser's silence given that Leser objected to the Guaranties' validity three-and-a-half months later.  *See e.g., Dallal v. New York Times Co.*, No. 05-2924, 2006 WL 463386, at *2 (2d. Cir. Feb. 17, 2006) (reversing district court's grant of summary judgment on equitable estoppel claim due to conflicted evidence as to whether party seeking estoppel had reasonably relied on supposed lack of timely and effective objections to unauthorized use of copyrighted material by party to be estopped).  Therefore, USB's motion for summary judgment based on equitable estoppel must be denied.

### 2. Doctrine of Ratification

As noted earlier, USB also raised the doctrine of

ratification as grounds for its motion for summary judgment
based on agency.  (Def.'s Mem. at 26.)  Specifically, USB argues
that Leser's acceptance of the benefit of the Seattle loan
proceeds amounts to his ratification of the Seattle Guaranties,
preventing him from "disavow[ing]" the actions of his agents.
(*Id.*)

   The doctrine of ratification is "'very closely
associated with estoppel.'"[16]  *In re Nigeria Charter Flights
Contract Litig.*, 520 F. Supp. 2d 447, 466 (E.D.N.Y. 2007).  It
is settled that New York recognizes the principle of
ratification, "which imputes an agent's conduct to a principal
who 'condones those acts and accepts the benefits of them.'"  *In
re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003)
(citation omitted).  "'Ratification requires acceptance by the
principal of the benefits of an agent's acts, with full
knowledge of the facts, in circumstances indicating an intention
to adopt the unauthorized arrangement.'"  *Cordts-Auth v. Crunk,
LLC,* No. 11- cv-4251, slip op., 2012 WL 1605817, at *5 (2d Cir.
May 9, 2012) (quoting *Monarch Ins. Co. of Ohio v. Ins. Corp. of
Ireland Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987)).  "'[A]ssent must
be clearly established and may not be inferred from doubtful or
equivocal acts or language.'"  *In re Nigerian Charter Flights*,

---

[16] Unlike estoppel, however, ratification does not require "a change of
conduct by, or prejudice to, the innocent third party."  *Holm v. C.M.P. Sheet
Metal, Inc.*, 89 A.D.2d 229, 232–33.

520 F. Supp. 2d at 466.  The principal's intent to adopt the arrangement may be "implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence." *Id*.  The timeliness of a party's repudiation, however, depends on the facts of the case.  *Capital Dist. Physician's Health Plan v. O'Higgins*, 951 F. Supp. 352, 362-63 (N.D.N.Y. 1997).  Additionally, "[r]easonable planning, investigation, and deliberation following discovery of an unauthorized act for the purpose of putting affairs in order will not constitute ratification by silence or acceptance of benefits." *Id*. (collecting cases).

In this case, material disputes of fact exist as to whether Leser's conduct after the purported date on which he learned of the Seattle Guaranty's existence amounted to ratification.  As noted above, Leser testified that he first learned of the Guaranties' supposed existence at the February 2009 meeting.  (Leser Dep. at 151-52.)  When USB referred to personal guaranties at the February 2009 meeting, Leser "look[ed] at [Verschleiser] and I said, maybe I didn't hear right or whatever.  I didn't want to make an issue with the bank in front of them – I didn't want to start a commotion immediately." (*Id*. at 161.)  Subsequently, Leser "started thinking, what are they talking about," "ask[ed] around" his

office, investigated the situation, arrived at the belief that USB defrauded him, and filed the Complaint three-and-a-half months later. (*Id.* at 151-52, 426-31; *see also* Compl. ¶¶ 19-24.)

Although there is no bright-line rule regarding how long a party can wait before its failure to repudiate will be deemed ratification, courts in this circuit and elsewhere have held that intervals of between three to four months, coupled with reasonable investigation, to be insufficient to establish ratification. *See, e.g., Capital Dist. Physician's Health Plan*, 951 F. Supp. at 362-63 (finding ratification was not established by delay of approximately four months between discovery of objectionable transaction and actual objection and repudiating party conducted reasonable investigation in the meantime); *Bernstein v. Centaur Ins. Co.,* 644 F. Supp. 1361, 1370 (S.D.N.Y. 1986) (three month silence after learning of unauthorized acts during which plaintiff undertook investigation did not amount to ratification); *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677-78 (7th Cir. 2004) (no ratification despite approximately six-month delay before repudiation, because investigation into whether repudiation was necessary was reasonable); *but see United States v. U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars ($660,200.00), More or Less*, 423 F. Supp. 2d 14, 24-25 (E.D.N.Y.

2006) (ratification occurred after delay in repudiation of approximately four months; no evidence of investigation), *aff'd on separate grounds*, 242 Fed. App'x 750 (2d Cir. Jul. 02, 2007).

Thus, given that Leser has set forth facts that create a genuine dispute as to whether his silence at the February 2009 meeting should be deemed ratification of the Seattle Guaranty, it is for the jury to decide whether, under all the circumstances of the case, ratification did occur. *In re Nigeria Charter Flights*, 520 F. Supp. 2d at 466 (denying motion for summary judgment based on ratification, noting that "unless the relevant facts are undisputed, the question of ratification is one for the jury"). USB's motion based on ratification is therefore denied as well.

## CONCLUSION

For the **foregoing** reasons, both parties' motions are denied with prejudice. Leser's motion for summary judgment on the Complaint and all of USB's Counterclaims is denied. USB's motion for partial summary judgment on the Seattle Guaranty is also denied. The parties are ordered to meet and confer and

contact chambers to schedule a conference to set a trial date

and pretrial briefing schedule.

**SO ORDERED.**

Dated:     Brooklyn, New York
           September 25, 2012

                         _____/s/_____
                         **KIYO A. MATSUMOTO**
                         United States District Judge
                         Eastern District of New York