UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
ABRAHAM LESER,

                Plaintiff,

        -against-

U.S. BANK NATIONAL ASSOCIATION,

                Defendant.
--------------------------------------X
U.S. BANK NATIONAL ASSOCIATION,

           Counterclaim Plaintiff,

        -against-

ABRAHAM LESER,

           Counterclaim Defendant.
--------------------------------------X
IN RE: Special Proceeding Brought by
U.S. Bank National Association
Against Abraham Leser, Edith Leser,
And Aron Mandel, as Nominee for
John Does 1-20

--------------------------------------X

**MEMORANDUM & ORDER**

09-CV-2362 (KAM)

**MATSUMOTO, United States District Judge:**

        Pending before the court is Defendant and Counterclaim

Plaintiff U.S. Bank National Association's ("USB") motion for a

1

preliminary injunction pursuant to Federal Rule of Civil Procedure 65 to enjoin Aron Mandel as nominee for certain purported creditors (the "Mandel Group") from taking any steps to execute or enforce the Confession of Judgment by Abraham Leser ("Leser") entered in Supreme Court for the State of New York, Kings County on January 17, 2013, until USB's petition for a turnover order made pursuant to Federal Rule of Civil procedure 69(a)(1) and New York Civil Practice Law and Rules Section 5225(b) is resolved.  For the reasons provided below, and upon review of the parties' submissions and the preliminary injunction hearing on July 18, 2013, the court grants USB's motion for a preliminary injunction.

## BACKGROUND

Based on the January 14, 2013 jury verdict in *Leser v. U.S. Bank National Association*, No. 09-cv-2362 (E.D.N.Y. filed June 4, 2009), judgment was entered by the court in favor of USB and against Leser in the amount of $52,946,419.15 on May 10, 2013.[1]  (ECF No. 231, Judgment, dated 5/10/13 ("Judgment").)  The Judgment provided that interest would accrue on that amount at the federal post-judgment statutory rate provided by 28 U.S.C. §

---

[1] Following the jury verdict, the court issued an order restraining Leser from "selling, transferring, assigning or interfering with any assets he directly owns or in which he has an interest until judgment is entered in this case." (ECF No. 215, Order Adopting Report and Recommendations, dated 3/7/13, at 7-8.)

1961(a) to the date the Judgment was satisfied.  (Judgment at
2.)  On June 19, 2013, USB filed a motion seeking an Order to
Show Cause for a Preliminary Injunction with a Temporary
Restraining Order, seeking a temporary restraining order ("TRO")
and preliminary injunction (i) against Leser's wife, Edith Leser
("Mrs. Leser"), restraining and enjoining her from selling,
transferring, assigning, encumbering, or otherwise interfering
with 200 shares in The Leser Group Ltd. ("TLG") that Leser had
allegedly transferred to her, and (ii) preventing Aron Mandel,
as nominee for purported creditors John Does 1-20, from taking
any steps to execute or enforce the Confession of Judgment
entered by Leser in Supreme Court for the State of New York,
Kings County on January 17, 2013 (the "Confession of Judgment")
until USB's petition for a turnover order was resolved.  (ECF
Nos. 240-248; USB's Memorandum of Law in Support of its Motion
was filed as ECF No. 248 ("Mot."))

        USB also filed its petition for a turnover order on
June 19, 2013 pursuant to Federal Rule of Civil Procedure
69(a)(1) and Section 5225(b) of the C.P.L.R.  (ECF No. 241-1,
Petition for Payment or Delivery of Property of the Judgment
Debtor, ("Turnover Pet.") dated 6/19/13.)  In its petition, USB
seeks an order pursuant to New York Debtor and Creditor Law (i)
setting aside Leser's transfer of his 200 TLG shares,
representing all of the equity in TLG, to Mrs. Leser, and (ii)

directing Leser to turn over those 200 TLG shares, representing all of the equity in TLG, to USB's agent, nominee, or a receiver appointed by the court.  USB also seeks an order (i) setting aside the Confession of Judgment, and (ii) directing Mandel to deliver any money or property he has obtained from enforcing the Confession of Judgment to USB and any TLG shares he has received from enforcing the Confession of Judgment to USB's agent, nominee, or a receiver appointed by the Court pursuant to N.Y.C.P.L.R. § 5225(b).

Third, U.S. Bank seeks attorneys' fees from Leser and Mandel.  Fourth, USB seeks a declaratory judgment against Leser and Mrs. Leser declaring that (a) the Pledge Agreement is null and void, (b) any transfer of the 200 shares is null and void, (c) that Leser is the legal owner of the 200 shares, and (d) USB has a superior interest in those shares because neither Leser or Mrs. Leser took steps to perfect Mrs. Leser's interest in the shares.  Similarly, as to the Mandel Group, USB seeks a declaratory judgment that (a) the Confession of Judgment is null and void, and (b) even if the Confession of Judgment is found to be valid in part, then USB still has a superior interest in Leser's assets to the purported unsecured creditors whose debts are found invalid as to the Confession of Judgment.  Finally, USB brings unjust enrichment claims against Mrs. Leser and Mandel.  (Turnover Pet.)

4

The court held a telephonic conference on June 20, 2013, at which counsel for USB, Leser, and the Mandel Group all entered appearances.  (Minute Entry for 6/20/13.)  Mrs. Leser did not appear despite receiving adequate notice of the hearing. (*Id.*)  After hearing from the parties, the court found a likelihood of success on the merits and that temporary relief was necessary to prevent immediate and irreparable harm to USB pending the hearing and determination of USB's order to show cause for a preliminary injunction and issued a TRO restraining (i) Mrs. Leser from selling, transferring, assigning, encumbering, or otherwise interfering with the 200 shares in TLG, and (ii) the Mandel Group from selling, transferring, assigning, encumbering, or otherwise dissipating the Confession of Judgment, or any assets obtained pursuant to the Confession of Judgment.  (ECF No. 251, Order to Show Cause for Preliminary Injunction with Temporary Restraining Order, dated 6/20/13.)

The TRO was extended for good cause until July 18, 2013, as requested by counsel for the Mandel Group, so that the parties would have adequate time to conduct additional expedited discovery and briefing.  (*Id.*)  On June 26, 2013, counsel for Mrs. Leser stated that Mrs. Leser would be willing to consent to a preliminary injunction until USB's petition for a turnover order was resolved.  (ECF No. 256, Motion for Extension of Time to File Response/Reply as to ECF No. 251 Order to Show Cause,

Consent to Preliminary Injunction by Edith Leser, dated 6/26/13.)  On July 1, with the consent of Mrs. Leser, the court issued a preliminary injunction enjoining Mrs. Leser from selling, transferring, assigning, encumbering, or otherwise interfering with the 200 shares in TLG until USB's petition for a turnover order was resolved.  (Docket Entry dated 7/1/13.)

The Mandel Group filed an opposition to the preliminary injunction on July 2, 2013.  (ECF No. 265, Memorandum in Opposition ("Opp."), dated 7/2/13.)  USB filed a reply in support of its motion for a preliminary injunction as to the Mandel Group on July 16, 2013, as well as a declaration and exhibits.  (ECF No. 282, Reply Memorandum of Law in Further Support of Order to Show Cause for Preliminary Injunction With Temporary Restraining Order, dated 7/16/13 ("Reply"); ECF No. 283, Reply Declaration Of Matthew D. Parrott In Further Support Of Order to Show Cause For Preliminary Injunction With Temporary Restraining Order, dated 7/16/13.)  The Mandel Group filed a surreply on July 17, 2013.  (ECF No. 284, Surreply, dated 7/17/13.)  USB filed a sur-surreply on July 17, 2013 (ECF No. 285, Sur-surreply, dated 7/17/13.)

The court held a hearing on July 18, 2013, during which the parties stated that they did not want to present any eyewitness testimony or additional documentary evidence.  The

court heard oral arguments from counsel for USB and the Mandel Group.

### A. USB Arguments

USB argues that there is a lack of evidence that the Confession of Judgment arose from valid pre-existing debts, and that the Confession of Judgment is likely to be considered both constructively fraudulent and actually fraudulent under New York Debtor and Creditor Law.  (Mot. at 22-25.); *see* N.Y.D.C.L. §§ 273, 273-a, 275, 276.  To that end, USB argues that any payment Leser makes or any assets collected to satisfy the Confession of Judgment would be considered a fraudulent transfer pursuant to section 273-a of New York Debtor and Creditor Law, as that provision makes fraudulent any "conveyance made without fair consideration when the person making it is a defendant in an action for money damages *or a judgment in such an action has been docketed against him.*"  N.Y.D.C.L. § 273-a (emphasis added).

USB asserts that the circumstances giving rise to the $35 million Confession of Judgment are replete with "badges of fraud," including, but not limited to, the chronology of events. On January 17, 2013, three days after the jury in the instant action returned a verdict in favor of USB and against Leser, Leser authorized entry of the Confession of Judgment in the Supreme Court of the State of New York, County of Kings.  (Mot.

7

at 10.)  According to USB, Leser stated that he would grant the
Confession of Judgment to the Mandel Group because the Mandel
Group was concerned that USB would secure a judgment against
Leser, thereby preventing Leser from paying back debts that he
owed them.  (*Id.* at 10-11.)  Leser testified under oath at his
deposition that he was in debt to these various unnamed lenders
for approximately $5 million to $10 million that he had borrowed
from them over the past 25 years.  (*Id.* at 11 (citing ECF no.
246-1, May 28, 2013 Deposition of Abraham Leser ("5/28/13 Dep.")
at 201-202.)  According to USB, Leser could offer no reasonable
explanation at his deposition for why the ultimate judgment was
three to five times more than his initial debt.  (Mot. at 23.)
In addition, USB argued that a judgment for $35 million could
not be valid if, as Leser explained, each purported creditor
wrote down the amount he thought Leser owed on a piece of paper,
and Leser agreed to pay the amount.  (*Id.* at 23-24.)

       USB argues that its constructive fraud claims are also
likely to succeed against Leser and the Mandel Group because,
under New York Debtor and Creditor Law, the Confession of
Judgment violated Sections 273 and 275 of New York Debtor and
Creditor Law because Leser, in signing the Confession of
Judgment, incurred debts beyond his ability to pay and rendered
himself insolvent without fair consideration.  (Mot. at 24.)
USB also contends that its actual fraudulent conveyance claims

8

against Leser and the Mandel Group are likely to succeed because
the circumstances surrounding the Confession of Judgment "bear
the badges of fraud": (i) the Confession of Judgment was
"shrouded in secrecy," (ii) the adequacy of consideration for
the Confession of Judgment was in doubt, (iii) the Confession of
Judgment was entered just three days after Leser was found
liable to USB, and (iv) Leser did not disclose the $35 million
Confession of Judgment to bondholders of TLG although he did
disclose the jury verdict to them.  (Mot. at 25.)  USB also
argues that it will suffer irreparable harm in the absence of a
preliminary injunction enjoining the Mandel Group from
dissipating Leser's assets, that it has presented serious
questions on the merits of its petition for a turnover order,
and that the balance of hardships tips in its favor.

### B. Mandel Group's Opposition

#### 1. The Mandel Group

The Mandel Group includes several different groups of
purported creditors.  First, the Schachter and Gold Creditors
claim that they loaned $2.5 million for a one year term to Leser
pursuant to a Promissory Note and Pledge Agreement on June 27,
2002, with a maturity date of June 27, 2003, at the "highest
rate permitted by law," which they claim is 25%, that Leser
immediately defaulted on his first monthly payment, and that
Leser now owes them more than $30 million.  (Opp. At 4-5.)  The

second purported creditor is Rafael Miller, who is now deceased
and represented by his son Chaim Miller, an employee of Leser
for 30 years.  Rafael Miller was a shareholder with Leser and
another individual of two companies.  Rafael Miller allegedly
transferred $3.5 million to those companies and claims that he
was entitled to a total of $8.1 million from the sale of the
properties and a $690,000 loan plus interest.  Third, the Mandel
Group claims that an individual named Isaac Stern loaned
$500,000 to Leser on February 6, 2006, and was not paid back by
him.  Fourth, the Mandel Group claims that Chaim Sieger and Hoyt
Capital LLC ("Sieger") loaned $1.5 million to Leser, that Leser
defaulted, and that they modified the loan so it carried a 14%
interest rate in addition to a $500,000 lump sum.  (*Id.* at 4-6.)

### 2. Mandel Group's Arguments

Based on affidavits and assorted documents that the
Mandel Group proffer as evidence of their purportedly valid
debts, the Mandel Group argues that they are secured creditors
with priority over USB.  (*Id.* at 7.)  The Mandel Group further
argues that (i) there is no priority among unsecured judgment
creditors in New York, (ii) USB's status as a creditor does not
entitle it to a turnover order against valid judgment creditors,
(iii) the Mandel Group does not actually possess the specific
property and thus cannot be the subject of a turnover order,
(iv) USB cannot succeed on the merits of its fraudulent

10

conveyance claims, (v) USB cannot succeed on the merits of its unjust enrichment claims, and (vi) the rabbinical arbitration award can only be subjected to limited judicial review.  (Opp. At 7-18.)  The Mandel Group filed a surreply on July 17, 2013, in which they argued that (i) USB did not have standing to challenge the arbitration award entered by the Rabbinical Tribunal, and (ii) the rabbinical arbitration award was valid. (ECF No. 284, Surreply, dated 7/17/13.)

### C. Additional Discovery Obtained by USB

The parties engaged in additional discovery as ordered by the court during the June 20, 2013 telephonic conference. (*See* Minute Entry dated 6/20/13.)  The Mandel Group presented affidavits and assorted financial records in opposition to USB's motion (ECF Nos. 265-1 to 265-18), and USB conducted depositions of Chaim Sieger ("Sieger"), Robert Schachter ("Schachter"), Isaac Stern ("Stern"), and Chaim Miller ("Miller"), all of whom had alleged claims in the Rabbinical Tribunal against Leser, as well as Rabbi Aron Mandel ("Mandel"), and Leser.

### 1. The Rabbinical Tribunal

Based on the depositions and documents presented by the Mandel Group and USB, the Court finds the following facts about the timing and circumstances of the $35 million arbitration and the filing of the Confession of Judgment: (i) the award was obtained from a local Rabbinical Court in favor of

11

Leser's longtime friends, neighbors, and an employee, all of
whom live near Leser and worship at the same synagogue,
indicating a strong possibility of collusion between the Mandel
Group and Leser, (ii) in late November 2012, Miller, a longtime
Leser employee and witness at the USB trial, came up with the
idea to enlist members of the Mandel Group to collectively agree
with Leser to participate in a Rabbinical proceeding before
which Mandel and Leser agreed to an award of $35 million against
Leser (Reply at 4; Miller deposition ("Miller Tr.") at 112-116),
(iii) each of the members of the Mandel Group was aware of the
upcoming trial of the USB claims against Leser when they agreed
with Leser to participate in the Rabbinical Tribunal, (*id.* at 5
(citing Sieger deposition ("Sieger Tr.") at 81-82; Schachter
deposition ("Schachter Tr.") at 28; Stern deposition ("Stern
Tr.") at 45; Miller Tr. at 113-114), (iv) the Mandel Group
agreed to proceed collectively against Leser in the Rabbinical
Tribunal, with Mandel as their nominee, even though their claims
were wholly unrelated, (*id.* (citing Mandel deposition ("Mandel
Tr.") at 39-40, 66)), and (v) Mandel met with each claimant once
and reviewed the documents provided by each claimant, (*id.*
(citing Mandel Tr. at 73-75.))

     The evidence further establishes that the Rabbinical
Tribunal lasted no more than two hours on December 13, 2012,
involved no formal presentation of evidence, and that Leser did

not oppose any of the claims, instead only asking for a
reduction in the aggregate interest allegedly due on all
obligations. (*Id.* (citing Mandel Tr. at 62, 74; Leser Tr. at
297, 300-301).)  Only Mandel, Leser, and the presiding judge,
Rabbi Yehuda Gruber, appeared at the Rabbinical Tribunal.  (*Id.*
at 6 (citing Mandel Tr. at 73; Leser Tr. at 293.)  Mandel
summarized the limited information he had received from the
Mandel Group, but he was not familiar with any default notices,
balance statements reflecting the accrued interest, or
documentation of efforts to collect the disputed amounts.  (*Id.*
(citing Sieger Tr. at 74; Schachter Tr. at 17, 22-23, 26, 44,
Stern Tr. at 12, 52-53; Miller Tr. at 110; Mandel Tr. at 45.))

        The Rabbinical Tribunal issued its decision four days
after the proceeding, on December 17, 2012, stating that Leser
owed "no less than the sum of $35 million," but did not identify
the creditors or the amounts due to each.  (ECF No. 283, Ex. 9.)
Also, the Rabbinical Tribunal decision stated that it would
"decide an exact calculation of each and who among the
plaintiffs has priority rights and to which asset" at an
unspecified date.  (*Id.*)  Leser executed a Confession of
Judgment on December 20, 2012, for $35 million, but it was not
filed until January 17, 2013, three days after the jury rendered
its verdict.  (ECF No. 246, Ex. 13; ECF No. 189, Jury Verdict.)
Leser did not disclose the Confession of Judgment to USB,

13

despite the court's March 7 pre-judgment restraining order
requiring him to produce documents "concerning his finances."
(ECF No. 215.)  Nor did Leser disclose the Confession of
Judgment to the bondholders of TLG, although he did disclose the
jury's verdict.  (Mot. at 10; ECF No. 246 at Ex. 27.)

### 2. The Mandel Group's Alleged Loans

The court also considered the information provided by
the Mandel Group and USB through additional discovery about the
alleged debts that Leser owed to the members of the Mandel
Group.

### a. Robert Schachter

Schachter claimed that he is owed over $30 million by
Leser, based on a promissory note from Leser dated June 27,
2002, with a one year maturity date of June 27, 2003, for a $2.5
million loan, that Leser had defaulted on his first payment,
which was due the first month, and that interest had been
accruing at a compounded 25% interest rate since 2003.  (Opp. at
Schachter Decl., Exs. C, D, E.)  Schachter testified there was
never any modification of the maturity date, and there is no
evidence that Leser ever provided any consideration for
extending the maturity date or signed any agreement to toll or
waive the statute of limitations.  (Reply at 9 (citing Schachter
Tr. at 21, 26-28, 32).)  Schachter claims, but did not document,
a single $300,000 payment by Leser on the note in 2005, but

14

testified that no extension of the maturity date was negotiated in connection with the payment. (*Id.* at 9 (citing Schachter Tr. at 19-21).)

### b. Chaim Sieger

Sieger claims that he and his company, Hoyt Capital LLC, are owed "over $2 million" by Leser, based on a loan to Leser in the amount of $1.5 million under two agreements, one executed in late 2010, and one modified in March 2011, and that Leser defaulted on his obligation to repay the loan. (Opp. at Sieger Decl., Ex. A.). The court finds that (i) financial records and checks Sieger produced in support of the purported indebtedness included two memoranda of understanding referencing an investment and not a loan, from Leser as a representative of Maple 60 Development LLC and Sieger as a representative of Hoyt Capital LLC, (ii) that the total amount of these investments based on the produced checks was $900,000, (Opp. at Ex. B; ECF No. 283 at Ex. 10), (iii) this investment appears to have been repaid in full as Sieger has admitted to receiving over $2 million from Leser since 2010, although Sieger claims the $2 million paid by Leser was for undocumented "personal loans" (Reply at 10 (citing Sieger Tr. at 93-95, 102-104, 105-106, 114-116, 122), and (iv) there is no basis for Sieger to claim the $2 million obligation as of the Rabbinical proceeding on December 13, 2012, because the Rabbinical Court decision on December 17,

15

2012, and the Confession of Judgment executed on December 20, 2012 took place approximately two weeks *before* Leser's obligation was fully due and payable under the terms of the March 7, 2011 investment memoranda. (*Compare* Opp. at Sieger Decl., Ex. A, *with* ECF No. 283 at Ex. 9.)

### c. Isaac Stern

Stern's claim for $1 million from Leser is based on a one-page letter signed by Leser, dated February 10, 2006, pursuant to which Leser acknowledged receiving $500,000 from Stern to be used toward the purchase of stock shares in a company called Megasphere. (Reply at 10; Opp. at Stern Decl., Ex. H.)  The agreement allegedly gave Stern the right to sell some or all shares on December 28, 2008, at which time he and Leser would divide the proceeds if there was a profit, but, in the event of a loss, Leser would accept "full personal liability" and reimburse Stern with a 12% return on the investment.  (Opp. at Ex. H.)  Stern claims Leser owes him $500,000 plus an addition $500,000 in interest.  (Reply at 10-11; Opp. at Stern Decl., Ex. H)  Stern admitted in his deposition that he never sought to exercise his right to sell the Megasphere shares that were the subject of the agreement such that his right to obtain a payment would have been triggered. (Reply at 11 (citing Stern Tr. at 39-40).)  In addition, Stern, Leser, and Mandel all admitted they had never

16

checked the price of Megasphere at the time of purchase, on December 20, 2008, or any other date. (*Id.* (citing Stern Tr. at 26, 28; Leser Tr. at 340, 350-51; Mandel Tr. at 51).) Stern and Leser claimed Megasphere either went out of business or was bankrupt but did not have or present documentary evidence about any bankruptcy. (*Id.* (citing Stern Tr. at 27, 52, 55-56; Leser Tr. at 351-52).)

### d. Chaim Miller

For thirty years, Miller has been a close friend and business partner of Leser and has had access to information about Leser's financial state. (Reply at 11 (citing Miller Trial Transcript at 1208-09, 1214-16, 1284-85).) Miller testified for Leser at the trial before this court. Miller says he is acting on behalf of his deceased father, Rafael Miller, who he claims was a creditor of Leser for "over $8.1 million" from "a combination of loans, equity investments, and proceeds from real estate transactions by businesses Miller's father co-owned with Leser." (*Id.* at 12 (citing Miller Decl., Miller Tr. at 68, 100-103).) Mandel admitted that he did not examine the Miller claim, which was lacking in documentation and clarity, but presented the aggregate $8.1 million Miller claim to the Rabbinical Court. (*Id.* (citing Mandel Tr. at 56-57).) It is unclear from the affidavit what basis, if any, Miller has to claim personal knowledge of the transactions his father

allegedly entered into with Leser and which form the basis of the claim.  No documents were provided regarding the entities, ownership of shares, or transactions, other than two handwritten notes allegedly written by Rafael Miller, wire instructions, and a 2006 K-1.  (Opp. at Miller Decl., Exs J, K.)

Based on the evidence before the court, the court finds that, at most, only a portion of the entire alleged claim, or less than $900,000, was attributable to a loan that Miller's father, Rafael, made in connection with Leser or entities in which he had an interest in 1998, which was paid in part from the proceeds of a 2000 real estate transaction.  (Reply at 12 (citing Miller Tr. at 80-86).)  Due to the lack of any evidence concerning the loan or the basis for any knowledge Miller may have had about a loan made by his father, the court does not find sufficient evidence that such a loan was made pursuant to a "*heter iska*," an agreement that required Leser to pay Miller's father 10 percent interest each year on the original investment, but did not require the return of the original investment.  (*Id.* (citing Miller Tr. at 80-81, 88; ECF No. 283, Ex. 12.)  The remainder of the alleged obligation to Miller's father were proceeds from the sale of properties in 2007 by JJ Lyons, a company in which Rafael Miller's estate had a 50 percent controlling interest.  (*Id.* (citing Miller Tr. at 100-101).)  The documents provided for the transaction, however, do not

18

mention Rafael Miller and do not show that Leser in an individual capacity, as opposed to JJ Lyons, was obligated to turn over 50 percent of the proceeds from the sale.  (*Id.* (citing Miller Tr. at 109).)  Finally, there is no documentary or testimonial support that 10% interest accrued every year on the JJ Lyons proceeds.  (*Id.* (citing Miller Tr. at 101-103).)

## DISCUSSION

### A. Legal Standards

### 1. Preliminary Injunction

In order to obtain a preliminary injunction, the moving party must show (1) that it will suffer irreparable harm in the absence of an injunction, and (2) either (a) a likelihood of success on the merits; or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decisively in the movant's favor. *See Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004); *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004); *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995).  A party need only show that the "probability of . . . prevailing [on the merits] is better than fifty percent" to demonstrate a likelihood of success on the merits.  *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (internal quotations and citations omitted).

## 2. Turnover Proceeding

Under the New York Civil Practice Law and Rules, a judgment creditor can bring a turnover petition under Section 5225(b) "against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee."  N.Y.C.P.L.R. 5225(b).  A judgment creditor may use Section 5225(b) "as the means to set aside a transfer made by a judgment debtor to defraud his creditors." *Gelbard v. Esses*, 465 N.Y.S.2d 264, 267 (N.Y. App. Div. 1983); *see also In re WBP Cent. Assoc., LLC v. DeCola*, 855 N.Y.S.2d 210, 211 (N.Y. App. Div. 2008) (claim to set aside an allegedly fraudulent conveyance of money, assets, or property may be asserted in a special proceeding pursuant to N.Y.C.P.L.R. 5225(b)).

Moreover, Section 5225(b) is not limited to instances where the respondent "has custody or possession of the funds or other property at issue . . . . [It] also permits a special proceeding to be brought against, and recovery to be had from, a *transferee* of money or other personal property from the judgment debtor if it can be demonstrated that the debtor is entitled to

the property or that the creditor's interest is superior to that of the transferee. This provision furnishes a mechanism for obtaining a money judgment against the recipient of a fraudulent conveyance who has, in the interim, spent or dissipated the property conveyed." *FDIC v. Conte*, 612 N.Y.S.2d 261, 262 (N.Y. App. Div. 1994) (emphasis added) (internal quotation omitted); *Gelbard*, 465 N.Y.S.2d at 267 (same). In addition, under the New York Debtor and Creditor Law, either a conveyance made or "*obligation incurred*," or, in this case, a Confession of Judgment, may be fraudulent. *See* N.Y.D.C.L. §§ 273, 275, 276 (emphasis added); *see also Ostashko v. Ostashko*, No. 00-CV-7162 (ARR), 2002 WL 32068357, at *18 (E.D.N.Y. Dec. 12, 2002) (setting aside confession of judgment as fraudulent conveyance under New York Debtor and Creditor Law).

### 3. Actual Fraud

To state a claim for actual fraudulent conveyance, a party must show that the conveyance was made or the obligation was incurred with "actual intent . . . to hinder, delay, or defraud either present or future creditors. N.Y.D.C.L. § 276. The determination of actual fraud depends upon an analysis of "badges of fraud" associated with the transaction, which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent," to hinder, delay, or defraud a present or future creditor. *See*

21

*Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, No 04-CV-4971, 2013 WL 417352, at *11 (E.D.N.Y. Jan. 29, 2013) (internal quotation and citation omitted).  Badges of fraud include (1) "a close relationship between the parties to the transaction," (2) a "hasty transfer" not made in the usual course of business, and (3) "inadequacy of consideration." *See id.*  Courts may also consider "the general chronology of the events and transactions under inquiry" as a badge of fraud. *Ostashko*, 2002 WL 32068357, at *18 (citation omitted).  Finally, it is well-established that if any component of a transfer is deemed fraudulent, the entire transfer must be voided in its entirety.  *See, e.g., HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) (when analyzing "multilateral transactions," courts often "collaps[e]" the transaction and treat it as a single transaction); *see also In re Dreier LLP*, 462 B.R. 474, 490 (Bankr. S.D.N.Y. 2011).

### 4. Constructive Fraud

To state a claim for constructive fraudulent transfer, a party must show that the transfer or obligation was (1) made or incurred without fair consideration, and (A) "by a person who is or will be thereby rendered insolvent," N.Y.D.C.L. § 273; or (B) by a person who is "a defendant in an action for money damages," *id*. § 273-a; or (C) "when the person making the conveyance or entering into the obligation intends or believes

that he will incur debts beyond his ability to pay as they mature," *id.* § 275.

## B. Analysis

### 1. Turnover Proceeding

The first issue for the court's determination is whether this action was properly brought pursuant to Section 5225(b) of the C.P.L.R.

The Mandel Group argues that this action is not properly brought under Section 5225(b) because (i) the turnover petition does not allege that the Mandel Group possesses property of the debtor, and (ii) USB's status as a creditor "does not entitle it to a turnover." (Opp. at 9-11.)  Both of these arguments are flawed.  First, Section 5225(b) clearly states that it applies to "a person who is a *transferee* of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee."  N.Y.C.P.L.R. 5225(b) (emphasis added).  In addition, New York courts have repeatedly held that Section 5225(b) proceedings can be "brought against, and recovery to be had from, a transferee of money or other personal property from the judgment debtor if it can be demonstrated that the debtor is entitled to the property or that the creditor's interest is superior to that of the transferee."

*Conte*, 612 N.Y.S.2d at 262 (internal quotation and citation omitted).   Therefore, the Mandel Group need not actually possess Leser's property to be the subject to a Section 5225(b) proceeding.

The other procedural arguments made by the Mandel Group are also unpersuasive.   First, there is no dispute that USB is a *judgment* creditor, as required by Section 5225(b), as this court entered Judgment for USB and against Mandel on May 10, 2013.   (Judgment.)   Second, as explained below, this court finds that USB's "rights to the property are superior" to the Mandel Group.   Third, it is settled under New York law that a judgment creditor may use Section 5225(b) "as the means to set aside a transfer made by a judgment debtor to defraud his creditors."  *Gelbard,* 465 N.Y.S.2d at 267.   Finally, USB may properly bring a turnover proceeding to set aside the Confession of Judgment as a fraudulent "obligation incurred" under New York Debtor and Creditor Law.  *See* N.Y.D.C.L. §§ 273, 275, 276; *see also Ostashko*, 2002 WL 32068357, at *18 (setting aside confession of judgment as fraudulent conveyance under New York Debtor and Creditor Law).

### 2. Actual Fraud

The second issue for the court is whether USB has shown a likelihood of success on its allegations of actual fraud, or that the Confession of Judgment was incurred with

24

"actual intent . . . to hinder, delay, or defraud either present or future creditors."  N.Y.D.C.L. § 276.

The court finds that there are clear and abundant "badges of fraud" such that USB has shown a likelihood of success on the merits, in that the Confession of Judgment is an obligation incurred under fraudulent and collusive circumstances rather than the product of a final adjudication of real debts owed by Leser to the Mandel Group.  First, as described above in Background, Part C.1, Leser and the Mandel Group are longstanding close friends and associates. *See supra* Part C.1. Second, Leser and the Mandel Group agreed to invoke the Rabbinical Tribunal in an attempt to effect a "hasty transfer," *see Fed. Nat'l Mortg. Ass'n*, 2013 WL 417352, at *11, in the form of an incurred obligation, without sufficient evidentiary support for the purported debts, in a proceeding that lasted less than two hours, *see supra* Part C.1.  Third, the chronology of events indicate collusion and fraud as Leser (i) agreed with the Mandel Group to participate in the Rabbinical Tribunal on December 13, 2012, during which he conceded that he owed $35 million to the Mandel Group, while also a counterclaim defendant in the instant federal action for money damages, (ii) agreed to a gross indebtedness of $35 million as set forth by the Rabbinical Tribunal on December 17, 2012, without a determination of the amounts owed to the Mandel Group members,

25

and (iii) executed the Confession of Judgment on December 20, 2012, but failed to disclose it to bond holders on the Tel Aviv Stock Exchange or to USB, even after this court's March 7 pre-judgment restraining order requiring him to produce documents "concerning his finances," (ECF No. 215).  Also, the Confession of Judgment was not filed until January 17, 2013, three days after the jury rendered its verdict against Leser in the instant federal action.  This chronology establishes a strong probability that Leser rushed to incur false obligations to shield his assets from a potential judgment against him in favor of USB.

Fourth, despite having secured a purportedly valid award of $35 million from a Rabbinical Tribunal and a Confession of Judgment, the Mandel Group did not take steps to enforce or collect the award or judgment prior to the TRO issued by this court.  (Opp. at 13 n.6.)  The evidence suggests that Leser and the Mandel Group intended to shield Leser's assets only from USB but not actually obtain repayment of any purported debts owed by Leser to the Mandel Group.  Thus, Leser appears to retain control of his money and property, another badge of fraud.  *Fed. Nat'l Mortg Ass'n*, 2013 WL 417352, at *11 ("retention of control of the property by the transferor after the conveyance" is a badge of fraud).

Finally, the purported debts owed by Leser to the Mandel Group are not supported by (i) adequate consideration, or (ii) sufficient evidence to establish that they were in fact legitimate debts.  Schachter's claim for over $30 million was time-barred by New York's six-year statute of limitations for a breach of contract claim, as it expired on June 27, 2009, and the note matured on June 27, 2003.  *See supra* Part C.2.a; *see also* N.Y.C.P.L.R. 213; *Cohan v. Movtady*, 751 F. Supp. 2d 436, 441 (E.D.N.Y. 2010).  Additionally, there is no indication that Leser (i) received any extension of the maturity date, or (ii) signed any agreement that would have tolled or waived the statute of limitations.  *See supra* Part C.2.a.  Thus, the Schachter claim appears to lack any consideration or other evidence to establish that it was a legitimate debt at the time of the Rabbinical Tribunal and the Confession of Judgment.  To the extent that the Mandel Group argues that Leser "waived" the statute of limitations and agreed to pay Schachter money he was not legally required to pay him, such behavior additionally suggests fraud as it shows Leser was trying to incur an artificial obligation to shield his money from USB.

Second, based on the evidence, the Sieger claim appears to be based on an investment and not a loan for, at most, $900,000.  It appears to have been fully repaid, and had not matured at the time of the Rabbinical Tribunal and the

Confession of Judgment.  *See supra* Part C.2.b.  Thus, the court finds that the Sieger claim was not a legitimate debt at the time of the Rabbinical Tribunal and was not supported by any fair consideration.

Third, there is inadequate evidentiary support in either documents or deposition testimony that Stern made a valid loan, rather than an investment in stock in relation to the Megasphere shares.  *See supra* Part C.2.c.  Stern lacks any evidence relating to the purported bankruptcy of Megasphere, the company at the heart of the claim.  Thus, Stern's claim for a debt is unsupported by evidence, other than a one-page letter from Leser acknowledging Stern's stock purchase and fails to establish adequate consideration.  *See supra* Part C.2.c

Finally, the Miller claim of "over $8.1 million" is lacking in evidentiary support and, at most, the $900,000 was provided pursuant to a *heter iska*, *see supra* Part C.2.d, an agreement that has been treated as an investment agreement, not a loan.  *See In re Venture Mortg. Fund, L.P.*, 245 B.R. 460, 477 (Bankr. S.D.N.Y. 2000) (noting that documents for a *heter iska* described the agreements as "partnership contributions rather than loans").  Additionally, there is a dearth of documentary evidence, or any other evidence, that *Leser*, as opposed to JJ Lyons, was liable to Rafael Miller.  Thus, the court finds that

the Miller claim is also suspect and without any real consideration as to Leser.

Given these numerous badges of fraud, the court finds that USB has a strong likelihood of success on the merits of showing that the Confession of Judgment was obtained pursuant to actual and constructive fraud because of (i) the numerous badges of fraud related to the chronology, procedures, and lack of evidence considered by the Rabbinical Tribunal, and (ii) the evidence suggesting that all of the alleged claims of the Mandel Group that were consolidated into a single $35 million Confession of Judgment were unsupported by even a modicum of legitimate documentary or testimonial evidence and appear to lack any fair consideration.

### 3. Constructive Fraud

The third issue for the court is whether USB has shown a likelihood of success on its allegations of constructive fraud.  The court finds that USB has provided sufficient evidence to demonstrate that it would prevail on the merits of its constructive fraud allegations.

First, as explained above, USB has provided sufficient documentary and deposition evidence to show that the Confession of Judgment was based on claims that were not supported by fair consideration.  *See supra* Part B.2.  To the extent that the Mandel Group argues that the existence of a valid antecedent

29

debt by Schachter is sufficient to defeat USB's constructive fraud claims, they are mistaken as fair consideration under New York law requires both equivalent value and "good faith," and the evidence discussed suggests that Leser and Schachter were not acting in good faith.  *See supra* Part C.2.a.

Second, there is no debate that Leser incurred the obligation while a counterclaim defendant on trial in a federal action for money damages as the Rabbinical Tribunal issued its decision on December 17, 2012, before the jury had rendered a verdict in *Leser v. U.S. Bank National Association*, No. 09-cv-2362 (E.D.N.Y. filed June 4, 2009), on January 14, 2013.

Finally, Leser has testified repeatedly about his precarious financial state and inability to satisfy a judgment. (*See* Mot. at 24.)  Therefore, USB has demonstrated that it has a reasonable chance of success on its constructive fraud claims because (i) the Confession of Judgment was not supported by fair consideration, (ii) Leser executed the Confession of Judgment, purportedly based on his compromise with the Mandel Group before the Rabbinical Tribunal, while a counterclaim defendant in the instant action for money damages, and (iii) Leser incurred debts that he believed would render him insolvent as a result of entering into the Confession of Judgment.

### 4. Other Arguments by the Mandel Group

As previously explained by the court, USB has demonstrated that it has a reasonable likelihood of success on the merits and will show that the Confession of Judgment obtained pursuant to a Rabbinical Tribunal was both actually fraudulent and constructively fraudulent.

Thus, the Mandel Group's argument that the Rabbinical Tribunal issued a *psak* that is beyond challenge by USB fails. First, as previously explained in Part C.1, the Rabbinical Tribunal did not consider any significant evidence, lasted less than two hours, and only reflected the "compromise" that Leser had reached with the Mandel Group but did not specify how much he owed to each member of the Mandel Group. *See supra* Part C.1. The Mandel Group does not cite any law, nor does this court find any law, which requires a federal district court to defer to an interim ruling entered by a single rabbi on behalf of the close friends and associates of a judgment debtor.

Second, the Rabbinical Tribunal ruling shows that it did *not* make a final determination on how much Leser allegedly owed to each creditor but instead specified it would only do so at a later date. *See supra* Part C.1; (*see also* ECF No. 283, Ex. 9.)  Third, because the Confession of Judgment was executed separately from the Rabbinical Tribunal judgment, it is not entitled to the deference that might be awarded to a legitimate

arbitration in New York state courts as the Confession of Judgment is separate from the Rabbinical Tribunal and does not reference it. (ECF No. 246, Ex. 13.)

Therefore, this court finds that USB has demonstrated a reasonable likelihood of success in prevailing on its constructive fraud claims and actual fraud claims related to the circumstances under which Leser signed the Confession of Judgment.

### 5. Irreparable Harm in the Absence of an Injunction

The fifth issue for the court is whether USB has shown that it will suffer irreparable harm in the absence of an injunction preventing the Mandel Group from executing, enforcing, selling, transferring, assigning, conveying, encumbering, or otherwise dissipating the Confession of Judgment, or any assets or rights obtained pursuant to the Confession of Judgment, until USB's petition for a turnover order is resolved.

In the absence of such an order against the Mandel Group, USB has established that it faces a considerable risk that it will be foreclosed from recovering sufficient assets to satisfy the Judgment in this action as Leser has testified that the value of his real estate holdings "dropped drastically" since 2007, (ECF No. 246, Ex. 14 at 429), and that a judgment requiring him to comply with his obligations to USB would "pull

32

down [his] whole life" and would send his career earnings "down the tubes," (*id.* at 85, 600).  Mandel has already attempted to perfect his interest in Leser properties by filing U.C.C. Financing Statements naming himself a secured party to corporations owned by Leser and as to Leser's personal assets before the USB Judgment was entered.  (ECF No. 246, Exs. 17-19.)

Courts have found that the dissipation or transfer of assets in order to frustrate a judgment creditor constitutes irreparable harm. *See Capital Distributions Servs., Ltd. v. Ducor Exp. Airlines, Inc.*, 440 F. Supp. 2d 195, 210 (E.D.N.Y. 2006) (granting plaintiff's motion for summary judgment in part and granting plaintiff's request for preliminary injunction where defendant had "taken steps to dissipate and conceal his assets and, unless the court issues an injunction, will continue to do so, which would frustrate [plaintiff's] attempts to collect a judgment against him, causing [plaintiff] irreparable injury"); *see also Ally Bank v. Reimer*, No. CV 09-2795, 2010 WL 446025, at *5-8 (E.D.N.Y. Jan. 29, 2010) (granting plaintiff's request for preliminary injunction to enjoin debtor and debtor's transferee from "transferring, dissipating, assigning, conveying, encumbering or otherwise disposing" of property while plaintiff's fraudulent conveyance claims were pending).

Therefore, USB will suffer irreparable harm in the absence of an injunction against the Mandel Group because assets

33

belonging to Leser may be transferred or dissipated and USB would not be able to collect its judgment.

### 6. Sufficiently Serious Questions on the Merits

Although the court has found that USB can show a likelihood of success on the merits of its turnover petition based on its claims for actual and constructive fraud, the sixth issue for the court is whether, in the alternative, USB has shown sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decisively USB's favor.

First, as discussed extensively above in Parts B.2 to B.4, USB has shown there are sufficiently serious questions going to the merits of its actual and constructive fraud claims to make them fair grounds for litigation in a turnover proceeding.

Second, the hardship to USB has been and will be substantial if the Mandel Group is able to dissipate Leser's assets pursuant to the Confession of Judgment before USB can collect the judgment it has obtained against Leser. *See supra* Part B.5. The Mandel Group, on the other hand, has stated to the court as of July 2, 2013, that they had not moved to seize any assets. (Opp. at 13 n.6.) Accordingly, the Mandel Group will not sustain any hardship if the status quo is maintained pending a decision on the turnover order.

34

**<u>CONCLUSION</u>**

For the forgoing reasons, the court finds that a preliminary injunction should be granted because USB has shown that (1) it will suffer irreparable harm in the absence of a preliminary injunction, and (2) a likelihood of success on the merits of its turnover petition, and, in the alternative, sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decisively in USB's favor.  Therefore, the court ORDERS a preliminary injunction enjoining Mandel and all members of the Mandel Group from executing, enforcing, selling, transferring, assigning, conveying, encumbering, or otherwise dissipating the Confession of Judgment, or any assets or rights obtained pursuant to the Confession of Judgment until USB's petition for a turnover order is resolved.


**SO ORDERED.**


_____/s/_____

KIYO A. MATSUMOTO
United States District Judge


Dated:     Brooklyn, New York
           July 18, 2013

35